UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Karen Goldberg, Chana Goldberg, Esther
Goldberg, Yitzhak Goldberg, Shoshana
Goldberg, Eliezer Goldberg, Yaakov Moshe
Goldberg and Tzvi Yehoshua Goldberg,

                    Plaintiffs,            CV-08-375 (CPS)


    – against –                            MEMORANDUM
                                           OPINION AND ORDER
UBS AG,


                    Defendant.


----------------------------------------X
SIFTON, Senior Judge.

        Plaintiffs Karen Goldberg and her seven children, Chana

Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg,

Eliezer Goldberg, Yaakov Moshe Goldberg, and Tzvi Yehoshua

Goldberg, commenced this action against defendant bank UBS AG on

January 28, 2008.  Plaintiffs bring claims under the civil remedy

provisions of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §

2333(a)[1] alleging that UBS is liable for: (1) aiding and abetting

the murder or attempted murder of a United States citizen or

causing the commission or attempted commission of physical

violence upon United States Citizens in violation of 18 U.S.C. §

_____

        [1] 18 U.S.C. § 2333(a) provides that "[a]ny national of the United States
injured in his or her person, property, or business by reason of an act of
international terrorism, or his or her estate, survivors, or heirs, may sue
therefor in any appropriate district court of the United States and shall
recover threefold the damages he or she sustains and the cost of the suit,
including attorney's fees."

2332(a)-(c)[2] and 18 U.S.C. § 2333(a); (2) committing acts of

international terrorism in violation of 18 U.S.C. § 2339B(a)(1)[3]

and 18 U.S.C. § 2333(a); and (3) collecting and transmitting

funds on behalf of a terrorist organization in violation of 18

U.S.C. § 2339C[4] and 18 U.S.C. § 2332(a).  Presently before this

court is defendant's motion to dismiss on grounds of (1) lack of

standing; (2) *forum non conveniens*; (3) unconstitutionality of

the ATA[5] as applied to UBS's conduct; and (4) failure to satisfy

---

   [2] 18 U.S.C. § 2332(a)-(c) provide criminal penalties for the killing or
conspiracy to kill "a national of the United States" by an individual outside
the United States, and for "whoever outside the United States engages in
physical violence . . . with the result that serious bodily injury is caused
to a national of the United States."

   [3] 18 U.S.C. § 2339B(a)(1) provides criminal and civil penalties for
"[w]hoever knowingly provides material support or resources to a foreign
terrorist organization, or attempts or conspires to do so," and requires that
"[t]o violate this paragraph, a person must have knowledge that the
organization is a designated terrorist organization . . .that the organization
has engaged or engages in terrorist activity . . .or that the organization
has engaged or engages in terrorism."

   [4] 18 U.S.C. § 2339C provides criminal and civil penalties for whoever
"by any means, directly or indirectly, unlawfully and willfully provides or
collects funds with the intention that such funds be used, or with the
knowledge that such funds are to be used, in full or in part, in order to
carry out . . . [an act] intended to cause death or serious bodily injury to a
civilian, or to any other person not taking an active part in the hostilities
in a situation of armed conflict, when the purpose of such act, by its nature
or context, is to intimidate a population, or to compel a government or an
international organization to do or to abstain from doing any act."

   [5] The Anti-Terrorism Act of 1990("ATA") comprises §§ 2332-2338 of title
18 of the U.S. Code, excluding sections 2332a-h.  The Act was enacted in 1990,
repealed for technical reasons in 1991, and reenacted virtually unchanged as
part of the Federal Courts Administration Act of 1992. *See* Pub. L. No.
102-572, § 1003, 106 Stat. 4506, 4521-24 (1992). The related provisions in §§
2332a-h and §§ 2339-2339D were enacted by various other laws, including the
Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132,
110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing
Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001
("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  For
simplicity's sake, I refer to all of these provisions collectively as "the
ATA."

the pleading standards of Federal Rule of Civil Procedure 8.   For
the reasons set forth below, defendant UBS AG's motion is granted
to dismiss the first count of plaintiffs' Complaint, and denied
in all other respects.

## I. BACKGROUND

The following facts are drawn from plaintiffs' Complaint and
the affirmations, affidavits and exhibits submitted in connection
with the present motion.   These facts alleged in the Complaint
are taken as true for purposes of the motion to dismiss, except
as noted.

## A.   The Parties

Plaintiffs are the widow and children of Stuart Scott
Goldberg, a Canadian citizen and Israeli resident killed in a
January 29, 2004 terrorist attack on a Jerusalem bus.[6]  Complaint
("Compl.") ¶¶ 5,7.   Plaintiffs are each dual citizens of the
United States and Israel and currently reside in the State of
Israel.   Compl. ¶¶ 7-9.

---

[6] That Stuart Goldberg was an Israeli resident appears nowhere in the
Complaint, but that fact is on the Israeli Ministry of Foreign Affairs Website
in a report on the victims of the Bus 19 bombing.   As the website's
authenticity is not disputed and appears not reasonably subject to question,
at least on this type of issue, I assume Israel to have been Mr. Goldberg's
country of residence.   *Oneida Indian Nation of New York v. State of N.Y.*, 691
F.2d 1070 (2d Cir. 1982) (citing Fed. R. Evid. 201(b)).

Defendant USB AG[7] ("UBS") is an international financial
institution headquartered in Basel and Zurich, Switzerland, with
offices in, among other locations, Israel and the United States.[8]
Compl. ¶¶ 12-14.  UBS's U.S. corporate headquarters is currently
located in New York City.  Compl. ¶ 13.

## B.  Hamas and its Financing

Plaintiffs' claims all arise out of a terrorist bus bombing
that occurred in Israel in January of 2004 and killed their
father or spouse.  Through this litigation, they seek to impose
liability on the defendant for its alleged role in facilitating
the transfer of funds to a terrorist group, Hamas,[9] which was
allegedly responsible for the bombing.

---

[7] According to UBS's website, the name "UBS" came from a predecessor
firm - the Union Bank of Switzerland. However, UBS is no longer considered an
acronym. The "AG" in the company's name means Aktiengesellschaft, which is the
equivalent to a shareholder-based corporation in the U.S.  Their papers
identify the party simply as "UBS AG"

[8] Defendant urges that the court take judicial notice of various facts
contained on UBS's own corporate website, including the number of UBS's
worldwide offices and employees, and the fact that UBS's Israel office is not
licensed to provide banking services in Israel.  I decline to do so.  While
the court may take judicial notice of the contents of a website for the fact
that such information was published and in the public realm, UBS attempts to
introduce these facts here for their truth.  *See Muller-Paisner v. TIAA*, 289
Fed. Appx. 461, 466 n.5 (2d Cir. 2008) (judicial notice may be taken of the
defendant's website for the fact of its publication).  Facts on Defendant's
own corporate website do not fall into the category of a "source[] whose
accuracy cannot reasonably be questioned" as required by Federal Rule of
Evidence 201.  Finally, even if the Court were to find such facts
unimpeachable, the Defendant has not stated whether the facts in question were
true as of the date of the 2003-04 banking transactions that allegedly give
rise to Defendant's liability in this case.

[9] "Hamas" is an acronym for "Harakat al-Muqawama al-Islamiyya," meaning
Islamic Resistance Movement.  Compl. ¶ 1 n.1.

Plaintiffs allege that Hamas is a terrorist organization founded in 1987 as an offshoot of an Egyptian radical Islamic group, the Muslim Brotherhood. Compl. ¶ 21. It has, according to the complaint, openly acknowledged perpetrating attacks which have resulted in the deaths of numerous civilians in Israel and the Gaza strip. Compl. ¶¶ 6, 22, 25-27. Because of its announced agenda, Hamas was designated a terrorist organization and "unlawful organization" by the State of Israel beginning in 1989. Compl. ¶ 23. The United States has designated Hamas as a Foreign Terrorist Organization ("FTO") since 1997 and as a Specially Designated Global Terrorist ("SDGT") since 2001. Compl. ¶¶ 31-32. Among those said to have been killed in Hamas's terrorist attacks have been a number of United States citizens. Compl. ¶¶ 30, 33.

While the Hamas organization includes both a terrorism component and a religious/social component, (Compl. ¶ 36), the two are, according to the complaint, interrelated, and the religious and social infrastructure used in part to recruit and train terrorists, while funds raised by Hamas for purportedly charitable purposes are in fact, according to the complaint, used to finance terrorist activities. Compl. ¶¶ 36, 43.

Financing for Hamas is said to be principally procured through an extensive network of "charities" and organizations that together make up the "Union of Good," an umbrella

organization established in 2000 to provide financial support for Hamas and its agents. Compl. ¶¶ 45-47. Among the members of the Union of Good is the Association de Secours Palestinien ("ASP"), an organization headquartered in Basel, Switzerland. Compl. ¶¶ 58, 61. According to the U.S. Treasury Department, ASP is the primary fundraiser for Hamas in Switzerland. Compl. ¶ 65. ASP was identified as a Hamas fundraising entity by President Bush on October 22, 2003 and placed on the Office of Foreign Assets Control ("OFAC") list as an SDGT. Compl. ¶¶ 63-64. ASP's parent organization, Comité de Bienfaisance et de Secours aux Palestinians, a/k/a Comité Bienfaisance pour la Solidarite avec la Palestine ("CBSP"), which is also a member of the Union of Good and shares the same chairman as ASP (Compl. ¶¶ 44, 60), has similarly been designated as a SDGT by the U.S. Government. Compl. ¶ 59. According to the Treasury Department, CBSP is the primary fundraiser for Hamas in France. Compl. ¶ 65.

Plaintiffs allege that despite the U.S. Government's designation of ASP as an SDGT on August 22, 2003, UBS continued to provide services for ASP, including transferring money from ASP's account to the account to a West Bank institution, the Tulkarem Zakat Committee. Compl. ¶¶ 69, 72-75. Three transfers are specifically alleged to have been made between October 3, 2003 and January 8, 2004, totaling approximately $25,000. *Id.* The recipient of the money, the Tulkarem Zakat Committee, was

designated as an "unlawful organization," (but not a "terrorist organization," a separate designation) by the Israeli government prior to the date of the transfers. Compl. ¶ 80.

## C.  The Bus 19 Attack

On January 29, 2004, suicide bomber Ali Ju'ara (aka Ali Jaara) is alleged to have detonated a bomb on Bus No. 19 in Jerusalem, killing 11 people and wounding 50 others. Compl. ¶ 15. Among those killed was Stuart Scott Goldberg. Compl. ¶ 7. Two terrorist groups claimed responsibility for the attack: Hamas and the Al Aqsa Martyrs' Brigades. Compl. ¶ 16. An Israeli Military Court subsequently indicted Nufal Adawin, identified as a Hamas member, for his involvement in the attack. Compl. ¶ 17. The Israeli indictment alleged that in planning the attack Adawin collaborated with at least one other Hamas member and was assisted by another terrorist group, Tanzim-Fatah. Compl. ¶¶ 18-19.

## II. DISCUSSION

The plaintiffs seek to hold defendant UBS liable for having provided financial services to the alleged terrorist organization, Hamas. Defendant raises several objections to the case being heard in this court, which I address first, before turning to the substance of the motion to dismiss. Jurisdiction

is alleged pursuant to 28 U.S.C. § 1331.

## A.  Standing

The threshold issue is whether plaintiffs have standing to bring this action.  The standing requirement serves as a constitutional limitation on the scope of cases that may be heard by federal courts.  *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324 (1984).  Taking its basis in the Constitution's Article III, § 2 provision that federal courts are empowered to decide only "cases" and "controversies," the analysis of whether a particular plaintiff has standing is composed of three essential elements:

> First, the plaintiff must have suffered an "injury in fact"–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992) (citations omitted; alteration in original). In deciding questions of standing on the basis of the pleadings, the court "accepts as true all material allegations of the complaint and construes the complaint in favor of the complaining party."  *Kendall v. Employees Retirement Plan of Avon Prods.*, 561

F.3d 112, 118 (2d Cir. 2009).  While the party invoking federal
jurisdiction bears the burden of establishing standing, at the
pleading stage general factual allegations that the injury
resulted from the defendant's conduct may suffice, because "on a
motion to dismiss we 'presum[e] that general allegations embrace
those specific facts that are necessary to support the claim.'"
*Lujan*, 504 U.S. 555 at 561 (citing *Lujan v. National Wildlife
Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990)).

The issue here is what constitutes a causal connection
sufficiently strong to render a plaintiff's injury "fairly ...
trace[able] to the challenged action of the defendant."  *Lujan*,
504 U.S. at 560, 112 S.Ct. at 2136.  Specifically defendant
argues that plaintiffs have failed to plead a sufficient causal
connection to establish standing because the actions of several
third parties (e.g. Nafal Adawin, Ali Ju'ara and various members
of Hamas) "break[] the causal chain" connecting defendant's
actions to plaintiffs' alleged injury.  Defendant's Memorandum of
Law in Support of UBS's Motion to Dismiss ("Def. Br.") at 24
(citing *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y.
2001)).  Defendant further contends that plaintiffs have not, and
cannot, show that the Bus 19 attack "most likely would not have
occurred if UBS had not processed ASP's three wire transfers."
Def. Br. at 25.

I conclude that plaintiffs have pled a sufficient causal

nexus to establish standing and that defendant's arguments are in this context without merit.  It is well-settled that the fact that a plaintiff's injury was not caused directly by the defendant is not itself a bar to standing.  *See Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992) ("A plaintiff does not lack standing simply by virtue of the indirectness of his or her injury.").  Rather, in order to establish that their alleged injury is "fairly" traceable to the challenged action, plaintiffs must simply allege facts which, if true, would demonstrate a causal connection between the defendant's conduct and the alleged injury.  Where intervening acts of third-parties exist, plaintiffs must at least allege the existence of each of the intermediate causal links in the chain from Defendant's action through to the ultimate harm.  *Sobol*, 962 F.2d at 156. Here, while a number of independent third parties were involved in the attack on Bus 19, plaintiffs have alleged a coherent and plausible causal nexus linking UBS's alleged wire transfers for ASP to the bombing of Bus 19.  Thus, plaintiffs plausibly allege that UBS provided material support to Hamas in maintaining an account for ASP, (Compl. ¶ 88), and in knowingly transferring money to Hamas-controlled entities (Compl. ¶ 86).  They further allege that Hamas's terrorist activities are fueled by the funds that flow into the organization, (Compl. ¶ 68)(quoting testimony by U.S. Treasury Department General Counsel David Aufhauser

before the Financial Services Committee, Subcommittee on
Oversight and Investigations, Sept. 24, 2003), and that Hamas was
responsible for the Bus 19 bombing in which Stuart Scott Goldberg
was killed.  Compl. ¶¶ 6, 17-18, 20.  This is sufficient to meet
their burden of establishing standing at this stage in the
pleadings.  *Kendall*, 561 F.3d at 118.  *See also United States v.*
*SCRAP*, 412 U.S. 669, 689, 93 S.Ct. 2405, 2417 (1973) ("If, as the
[defendants] now assert, these allegations were in fact untrue,
then the appellants should have moved for summary judgment on the
standing issue").

    *United States v. SCRAP* is illustrative of the relatively low
burden a plaintiff must meet at the pleading stage in order to
establish causation for standing purposes.  In *SCRAP*, an
environmental group was held to have standing to challenge the
Interstate Commerce Commission's failure to suspend a 2.5%
freight rate surcharge proposed by a number of railroad
companies.  Plaintiff's claimed causal connection was that:

> a general rate increase would [] cause increased use of
> nonrecyclable commodities as compared to recyclable goods,
> thus resulting in the need to use more natural resources to
> produce such goods, some of which resources might be taken
> from the Washington area, and resulting in more refuse that
> might be discarded in national parks in the Washington area.

*SCRAP*, 412 U.S. at 688, 93 S.Ct. at 2416.  While the court
concluded the causal connection was attenuated, plaintiffs were
nonetheless found to have standing because they had laid out the

series of links which, if true, would causally connect the
challenged action to the ultimate harm.  *Id.*  The alleged causal
nexus here is more direct.

Defendant further contends that plaintiffs lack standing
since they did not allege, and can not prove, that the Bus 19
attack "most likely would not have occurred if UBS had not
processed ASP's three wire transfers."  Def. Br. at 24.  However,
the law does not impose such a requirement.  Were defendant's
"but-for" causation requirement in fact the applicable standard
for establishing standing, federal courts would lack jurisdiction
over any case or controversy where several acts each
independently would have sufficed to cause the harm.[10]  Under
such a standard, plaintiffs' pleading burden in establishing
standing would often exceed its burden on the merits, since but-
for causation is not required for plaintiffs to ultimately
succeed at trial.  *See, e.g.*, *Linde v. Arab Bank PLC*, 384 F.
Supp. 2d. 571, 584-85 (E.D.N.Y. 2005) (holding that in order to
prevail on the merits "there is no requirement of a finding that
the suicide bomber would not, or could not, have acted but for
the assistance of Arab Bank.").  Defendant has cited no case
support for the proposition that in order to establish standing,

---

[10] A concept often described as "overdetermination."  *See, e.g.*, Derek
Turner, *Making Prehistory: Historical Science and the Scientific Realism
Debate* 38 (2007) (providing, as an illustration of overdetermination, an
incident where a firing squad executes an individual, but any one shot would
have been sufficient to kill him.)

a plaintiff must allege that a particular harm "most likely would not have occurred" but for the defendant's actions. Rather, courts in this district have held that a plaintiff must allege facts "from which it could be reasonably inferred that, absent Defendants' unlawful acts, there is a substantial probability" that plaintiffs wouldn't have suffered harm. *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001). What plaintiffs must allege are facts from which it may be inferred that cessation of the defendant's allegedly illegal activity would "make an appreciable difference" in bringing about the harm which is the subject of the complaint. *Allen*, 468 U.S. 737, 758, 104 S.Ct. 3315, 3328. Here plaintiffs have alleged facts which, if true, demonstrate that UBS's client ASP is "a pivotal part of Hamas's fundraising structure and a significant source of Hamas's financing," Compl. ¶ 84, and that terrorist activity, including the act that killed Stuart Scott Goldberg, depends on financing of a type similar to the three monetary transfers from ASP to the Tulkarem Zakat Committee allegedly effected by UBS. Compl. ¶ 43. Plaintiffs have accordingly met their burden of establishing a causal nexus between the defendant's conduct and the harm complained of for the purposes of standing.

## B. *Forum Non Conveniens*

I now turn to the question of whether this action should dismissed on *forum non conveniens* grounds. The doctrine of *forum*

*non conveniens* ("FNC") grants a court discretion, "to resist
imposition upon its jurisdiction," even though jurisdiction may
be lawfully exercised and venue is technically proper, where the
convenience of the parties and interests of justice favor trial
in another forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507,
67 S.Ct. 839 (1947). In considering the Defendant's *forum non
conveniens* argument, I have relied on the plaintiffs' Complaint,
and on the affirmations, affidavits and exhibits submitted in
connection with the present motion, but have not presumed all
facts pleaded to be true. *See Alcoa S.S. Co. v. M/V Nordic
Regent,* 654 F.2d 147, 158-59 (2d Cir. 1980) (en banc) ("[I]t is
the well established practice . . . to decide [*forum non
conveniens*] motions on affidavits")*, cert. denied*, 449 U.S. 890
(1980); *see also Construtora Norbeto Oderbrecht S.A. v. Gen.
Elec. Co.*, No. 07-cv-8014 (CM), 2007 WL 3025699, at *1 (S.D.N.Y.
Oct. 12, 2007) ("On a motion to dismiss pursuant to forum non
conveniens, a court considers not only the allegations of the
pleadings but all evidence before it, and does not presume the
facts pleaded to be true.")


## 1. Traditional FNC Analysis vs. 18 U.S.C. § 2334(d)

The parties agree that *forum non conveniens* analysis is
governed by the ATA, which includes explicit provisions

concerning that subject in 18 U.S.C. § 2334(d).  However, the

parties disagree regarding the extent to which the language of 18

U.S.C. § 2334(d) dictates an analysis stricter than that

typically used.

In the usual case, the Second Circuit employs a three-part

FNC analysis.  First, the court must determine the degree of

deference properly accorded to plaintiff's choice of forum.

*Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

Second, the court must determine whether an alternative and

adequate forum exists.  *Id.* at 73.  Lastly, the court must

balance the private and public interests implicated in the choice

of forum.  *Id.* at 73-74.  To prevail on a motion to dismiss based

on *forum non conveniens*, a defendant must typically demonstrate

that an adequate alternative forum exists and that, considering

the relevant private and public interest factors set forth in

*Gilbert*, the balance of convenience tilts strongly in favor of

trial in the foreign forum.  *R. Maganlal & Co. v. M.G. Chemical

Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

In cases brought under 18 U.S.C. § 2333, the ATA prescribes

a different standard.  That provision, codified as 18 U.S.C. §

2334(d), provides that:

> The district court shall not dismiss any action brought
> under section 2333 of this title on the grounds of the
> inconvenience or inappropriateness of the forum chosen,
> unless—

(1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;

(2) that foreign court is significantly more convenient and appropriate; and

(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

The requirements of 18 U.S.C. § 2334(d) are on the face of it more difficult to meet than those of traditional FNC analysis. The few courts that have addressed the issue have reached the same conclusion. *See Linde*, 384 F. Supp. 2d at 591 n.13 ("Defendant has failed to meet its burden of showing that this *heightened* standard for dismissal under the ATA has been met.")(emphasis added); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 99-100 (D.R.I. 2001)(citing heightened standard imposed by 2334(d)). Secondary sources are in accord. *See*, John D. Shipman, Comment, *Taking Terrorism to Court: A Legal Examination of the New Front in the War on Terrorism*, 86 N.C. L. Rev. 526, 554 (2008) (citing *Linde* and noting heightened standard); Captain Gal Asael, *The Law in the Service of Terror Victims; Can the Palestinian Authority be Sued in Israeli Civilian Courts for Damages Caused by its Involvement in Terror Acts During the Second Intifada?* 2008 Army Law. 1, 28 (Jul 2008) (citing higher standard imposed by § 2334(d)).

The difference between the two standards is most visible in their provisions concerning the suitability of the proposed alternate forum.  Under the traditional FNC analysis, a defendant must be able to show that an "adequate alternative forum exists," *Iragorri*, 274 F.3d at 73.  However, in order to qualify as "adequate", an alternative foreign forum need *not* have equivalent, or even substantially similar remedies.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 262 (1981).  For example, in *Transunion Corp. v. PepsiCo. Inc.*, 811 F.2d 127, 129 (2d Cir. 1987)(per curiam), the Second Circuit held the Philippines was an "adequate" alternative forum notwithstanding the fact that Philippine law provided no treble damage remedy equivalent to that available under the plaintiffs' RICO claim. ("That they could not get triple damages if they proved the frauds underlying their RICO claim in the Philippines is irrelevant.") Indeed, the adequacy prong of the traditional FNC analysis can be satisfied by the existence of essentially *any* remedy:

> "A forum in which defendants are amenable to service of process and which permits litigation of the dispute is generally adequate. Such a forum may nevertheless be inadequate if it does not permit the reasonably prompt adjudication of a dispute, if the forum is not presently available, or if the forum provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all."

*Abdullahi v. Pfizer*, Inc., 562 F.3d 163, 189 (2d Cir. 2009)

(citations omitted).

In contrast, under the ATA, a Defendant must be able to show "that foreign court offers a remedy which is *substantially the same* as the one available in the courts of the United States." 18 U.S.C. § 2334(d) (emphasis added).

## 2. The Meaning of "Substantially The Same" in Light of the History and Purpose of the ATA

Assuming without deciding that defendant UBS could meet its burden of establishing the first two requirements in 18 U.S.C. § 2334(d), I conclude that UBS has not met its burden of showing that the adequate alternative forum, Israel, offers a remedy which is "substantially the same" as the one available in the U.S.

As I am aware of no decision interpreting this phrase in the context of the ATA and the parties have cited no case law on this point, I address this issue as an issue of first impression. While the words themselves are not defined, their meaning may be gleaned from the general purposes for which the ATA was enacted, and how the language in question fits into that statutory scheme. *Almendarez-Torres v. United States*, 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) ("We therefore look to the statute before us and ask what Congress intended. . . . In answering this

question, we look to the statute's language, structure, subject matter, context, and history-factors that typically help courts determine a statute's objectives and thereby illuminate its text.").

In passing the ATA, Congress was explicitly attempting to extend U.S. jurisdiction to terroristic acts occurring abroad. Congress acknowledged that "[e]nactment of the bill would marginally increase the number of cases in U.S. District Courts," H.R. Rep. 102-1040, at 9, but that it was important to "allow[] any U.S. national injured in his person, property, or business by an act of international terrorism to bring a civil action in a U.S. District Court." H.R. Rep. 102-1040, at 5. The Act was not designed simply to afford *some* forum to victims of terrorism; it was designed to give them a forum in the courts of the United States. 138 Cong. Rec. S17254-01, S17260 ("the first and best remedy is to bring these terrorists to justice in our courts of law.") (emphasis added). *See also Statement by President H.W. George Bush Upon Signing S. 1569*, 1992 U.S.C.C.A.N. 3942, 1992 WL 475753 (October 29, 1992) ("I am pleased that the bill explicitly authorizes an American national to file suit *in the United States* for the recovery of treble damages against the perpetrators of international terrorism.")(emphasis added); Statement of Senator Grassley, 136 Cong. Rec. S4568-01 at S4593 ("With the enactment of this legislation, we set an example to the world of how the

United States legal system deals with terrorists.").

An essential inspiration for the ATA was a then-recent case of *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 739 F. Supp. 854 (S.D.N.Y. 1990) in which relatives of an individual murdered during the hijacking of the *Achille Lauro* cruise ship brought suit against the Palestine Liberation Organization ("PLO") for its alleged responsibility for the hijacking. In enacting the ATA, Congress was cognizant that federal court jurisdiction existed in *Klinghoffer* only because of happenstance: the attack occurred aboard a ship in international waters and maritime law provided the necessary jurisdiction. *See* H.R. Rep. 102-1040, at 5 (1992) ("Only by virtue of the fact that the [Klinghoffer] attack violated certain Admiralty laws and the organization involved -- the Palestinian Liberation Organization -- had assets and carried on activities in New York, was the court able to establish jurisdiction over the case. A similar attack occurring on an airplane or in some other locale might not have been subject to civil action in the U.S. In order to facilitate civil actions against such terrorists the Committee [on the Judiciary] recommends [this bill]."). Thus, contrary to defendant's contention that Congress merely intended to ensure "that victims of terrorism would have an appropriate forum, *somewhere*, to pursue their claims," Def. Br. at 8 (emphasis in original), the

legislative history establishes that providing jurisdiction in the Federal Courts of this country was a fundamental purpose of the statute.  *See also Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief And Dev*. ("Boim II"), 291 F.3d 1000 (7th Cir. 2002) (summarizing legislative history).

Second, reference to the adequacy of remedies in the bill were not an afterthought, but rather was conceived of as a mechanism through which to accomplish the primary purposes of the act.  *See See* S. Rep. No. 102-342 ("[B]y its provisions for compensatory damages, treble damages, and the imposition of liability along the causal chain of terrorism, it would interrupt, or at least, imperil, the flow of money.").  *See also* 136 Cong. Rec. S14279-01, S14284 (daily ed. Oct. 1, 1990) ("terrorists will be held accountable where it hurts them most: at their lifeline, their funds.").

Thus the legislative history as well as the language of the statute demonstrate that the ATA was designed to give American nationals broad remedies in a procedurally privileged U.S. forum, and that 18 U.S.C. § 2334 in particular was designed to protect plaintiffs' access to that forum.  Accordingly, I interpret 18 U.S.C. § 2334's requirement that a remedy be "substantially the same" to mean one that is essentially the same in both type and magnitude as that afforded in this jurisdiction.

*3.  Defendant Fails to Satisfy the "Substantially the Same"*
*Remedy Prong of 18 U.S.C. § 2334(d)*

While the declarations submitted by experts on both sides
who are familiar with Israeli law present the proverbial "battle
of the experts" –- due in part to apparent ambiguities in the
applicable foreign law –- taken together, they demonstrate that
the remedies available under Israeli law differ substantially in
both type and magnitude from those available in this court.

*First*, the measure of damages is different.  The ATA permits
a successful plaintiff to recover treble damages plus the cost of
bringing suit, including attorneys fees. 18 U.S.C. § 2333.
Israeli law contains no provision for treble damages.
Declaration of Professor Alex Stein ("Stein Decl.") at ¶ 22.
Defendant makes arguments that the damages available under
Israeli law are in fact still "substantially the same," but they
fail.[11]  Nonetheless, though I conclude that while the absence of
a treble damages remedy under Israeli law is a significant factor

---

[11] Defendant contends that despite the absence of treble damages, the
Israeli court's measure of damages is nonetheless comparable because that
court might in an exceptional case grant punitive damages, and because an
additional cause of action could be brought on behalf of the estate of the
deceased.  But it is not disputed that Israeli courts grant punitive damages
only in extremely rare cases, Stein Decl. ¶ 27, that whether an Israeli court
would impose punitive damages on these facts is uncertain, at best, Stein
Decl. ¶ 30, and that the amount of those damages, if awarded, would likely be
modest by American standards. *Id*.  Defendant's expert does not dispute these
assertions but simply contends that it is *possible* an Israeli court could
award significant punitive damages.  Reply Declaration of Professor Daniel
More ("More Reply Decl.") ¶  20.

weighing against FNC dismissal,[12] defendant has mitigated any

effect by offering to stipulate trebling any compensatory damage

award determined by an Israeli court.[13]  Def. Br. at 15.

    *Second*, and more significantly, Israel lacks a mechanism by

which plaintiffs could obtain compensation for their emotional or

non-economic injury.  Specifically, it is undisputed that Israeli

courts exclude emotional harm from loss-of-consortium damages by

limiting those damages to the economic value of a substitute's

cost on the market (e.g. the cost of obtaining a housekeeper, to

compensate for the lost spouse's contribution to the maintenance

of the household).  Israeli law provides no compensation in a

wrongful death suit for the loss of companionship, affection and

intimacy by the immediate family members of the victim.  Stein

Decl. ¶ 37-38, More Reply Decl. ¶ 10.  Under Israeli law

emotional injury suffered as a result of the death of a loved one

is generally not compensable unless it manifests as a psychiatric

---

[12] In concluding that the absence of a treble damages remedy under
Israeli law is a significant factor weighing against FNC dismissal, I note
that this conclusion is applicable only to FNC analysis governed by of 18
U.S.C. § 2334(d)(3).

[13] Such stipulations can assuage courts' concerns regarding potential
deficiencies in the adequacy of a foreign tribunal, and a court may condition
dismissal on the parties agreeing to such stipulations.  *See, e.g.*, *Reino De
Espana v. ABSG Consulting, Inc.* Nos. 08-0579-cv(L), 08-0754-cv(XAP), 2009 WL
1636122 at *1 (2d Cir. June 12, 2009) ([defendant's] willingness to stipulate
to personal jurisdiction in an alternative forum is a relevant factor to any
declination of jurisdiction").  *See generally* Tim A. Thomas, Annotation,
*Validity and Propriety of Conditions Imposed Upon Proceeding in Foreign Forum
by Federal Court in Dismissing Action Under Forum Non Conveniens*, 89 A.L.R.
Fed. 238 (1988).

illness.[14]  Stein Decl. ¶ 33(4).  Further, emotional harm is

generally not compensable under Israeli law unless the plaintiff

has established a reasonable causal proximity in both time and

place, between the event and the emotional harm, and plaintiff

either personally experiences the tragic event, or in an

exceptional case, learns about the event in such circumstances

that the emotional damage is "expectable."  Stein Decl. ¶

33(2)&(3).[15]

The cumulative result of these distinctions is that

plaintiffs would have no adequate remedy under Israeli law for

emotional injury not rising to the level of a medically

diagnosable disability.  Moreover, defendant UBS does not

seriously dispute the opinion of Plaintiffs' expert that Israeli

courts are unlikely to award a quantum of damages that approaches

that which is typical in this jurisdiction, Stein Decl. ¶¶ 41-43,

except by noting the commonplace that it is difficult to predict

---

[14] Defendant's expert contends that plaintiffs' allegations of severe
mental anguish and extreme emotional distress would, if proven, "most probably
[] be sufficient to satisfy" Israeli law. More Reply Decl. ¶ 16. However, he
cites no case law in support of this conclusory statement, and the only cases
cited by either party are to the contrary,  Stein Decl. ¶ 31, 34, or at best
suggest that Israeli courts might revisit the doctrine at some time in the
future.  More Reply Decl. ¶ 14.  Moreover, defendant's expert does not state
the basis for his conclusion that a medical professional would find the
plaintiffs to be at least 20% incapacitated.  For these reasons, I do not
credit his conclusion that Israeli law would "most probably" compensate the
mental distress alleged by plaintiffs.

[15] The parties have not addressed the question of whether the lack of
geographic and temporal proximity would pose an independent bar to recovery
for plaintiffs' emotional injuries under Israeli law.  As it is defendant's
burden to prove a substantially similar remedy, the failure to address this
point weighs against the defendant.

how much any court (whether U.S. or Israeli) would award in damages. It is certainly not impossible to compare the average awards between two jurisdictions over a period of time, as done in the declaration of plaintiffs' expert, who concludes such awards in Israel are typically lower than those in the United States.

## C.  Motion To Dismiss

I next address defendant's motion to dismiss for failure to state a claim for which relief can be granted. Defendant raises six arguments in favor of dismissal: 1) since Stuart Goldberg was not a United States national, plaintiffs fail to state a claim under ATA section 2332; 2) plaintiffs have not alleged an injury as required by section 2333; 3) plaintiffs fail to allege that defendant UBS committed an act of international terrorism; 4) plaintiffs haven't pled the required elements of knowledge and intent; 5) plaintiffs have not adequately pled the "by reason of" element of section 2333(a); and 6) plaintiffs haven't sufficiently pled their claims under section 2339. I address each in turn.

*Standard*

In considering a motion pursuant to Rule 12(b)(6), I

construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal citations and quotations omitted), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000).

However, more recently, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1970 (2007). Although the complaint need not provide "detailed factual allegations," *id.* at 1964; *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (applying the standard of plausibility outside *Twombly*'s anti-trust context), it must "amplify a claim with some factual allegations . . . to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in

original).  The complaint must provide "the grounds upon which
[the plaintiff's] claim rests through factual allegations
sufficient 'to raise a right to relief above the speculative
level.'"  *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 127
S.Ct. at 1965).  Finally, a complaint must be dismissed under
Rule 12(b)(6) if a court finds that the plaintiff's claims are
barred as a matter of law.  *Conopco, Inc. v. Roll Int'l*, 231 F.3d
82, 86 (2d Cir. 2000).

## 1.  *Aiding and Abetting Liability*

Plaintiffs' first cause of action is confused.  They allege
UBS aided and abetted the murder or attempted murder of United
States citizens or the commission or attempted commission of
physical violence upon United States citizens in violation of 18
U.S.C. § 2332(a)-(c) and 18 U.S.C. § 2333(a).  However, the
deceased victim, Stuart Scott Goldberg, was not a United States
citizen and is not alleged to be a United States national as
required by § 2332.  Since there is no primary violation of §
2332, defendant UBS cannot be guilty of aiding and abetting such
a violation.  The statute is clearly inapplicable.

Acknowledging in their papers that there is no basis for a §
2332 violation, plaintiffs ask that their Complaint be read to
instead allege defendant UBS aided or abetted an act of
international terrorism (as defined in § 2331) which would thus

in turn constitute a violation of § 2333(a). Assuming arguendo that 1) I were able to read plaintiffs' complaint to in fact make that allegation; and 2) that aiding and abetting liability exists under section 2333, I nonetheless find plaintiffs have failed to sufficiently plead such a claim.

Courts are divided on whether Congress intended to include aiding and abetting liability for a violation of § 2333(a). The Seventh Circuit recently issued a comprehensive opinion on the subject in *Boim v. Holy Land Foundation for Relief and Development* ("Boim III"), 549 F.3d 685 (7th Cir. 2008) (en banc), and held that Congress's "[s]tatutory silence on the subject of secondary liability [in § 2332] means there is none." *Id.* at 689 (citing *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994). In contrast, other courts have found that "Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to those who aid and abet of terrorism. *Linde*, 384 F. Supp. 2d at 583 (citing *Boim II*, 291 F.3d at 1019). However, even those courts finding section 2333 includes aiding and abetting liability have held that such liability exists only where a defendant "gives substantial assistance or encouragement to the other so to conduct himself." *Linde*, 384 F. Supp. 2d at 584 (quoting Restatement (Second) of Torts, § 876 (1979)). It has

long been recognized that "'substantial assistance' means more than just a little aid," *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir. 1986), and requires knowledge of the illegal activity that is being aided and abetted, a desire to help that activity succeed, and some act to further such activity to make it succeed. *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir. 1991), *aff'd*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)

I need not resolve here whether aiding and abetting liability exists for violations of section 2333 because defendant's alleged actions in performing three wire transfers for ASP fail to establish "substantial assistance" of the sort required to support an aiding and abetting claim. *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006) ("the mere maintenance of a bank account and the receipt or transfer of funds do not . . . constitute substantial assistance"); *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS), 2006 WL 2862704, at *9 (E.D.N.Y. Oct. 5, 2006)(same). *Cf. Boim III*, at 1011 ("To say that funding *simpliciter* constitutes an act of terrorism is to give the statute almost unlimited reach.").

Plaintiffs argue that *Linde v. Arab Bank*, 384 F. Supp. 2d at 571, supports aiding and abetting liability here. But that case is distinguishable because the assistance alleged was an order of

magnitude greater than in this matter.  In *Linde*, plaintiffs
alleged that an extremist organization, the Saudi Committee in
Support of the Intifada Al Quds ("Saudi Committee"), provided
rewards for perpetrators of suicide bombings by paying
approximately $5,316.06 to the families of Palestinian terrorists
who died as "martyrs".  384 F. Supp. 2d at 577.  In order to
claim the benefits, families of a suicide bomber were required to
present the defendant, Arab Bank, with an official certification
from the Palestinian Authority identifying their relative as a
martyr and providing a individualized martyr identification
number.  The Bank was also alleged to have an active role in
finalizing the list of eligible martyrs, in collaboration with
the Saudi Committee and local representatives of Hamas.  *Id.*  In
sum, the bank was alleged to have acted essentially as the
officially designated administrator for terrorism incentive
payments.  Here, plaintiffs have alleged only that defendant UBS
transferred funds to institutions that were part of Hamas's
financial infrastructure, including some which had been declared
unlawful by the Government of Israel.  Compl. ¶ 71.  Even if, as
plaintiffs allege, the defendant had knowledge of the designation
of its client, ASP, as an SDGT by the U.S. government, and the
designation of the payments' recipients as unlawful organizations
by the Israeli government, defendant UBS's assistance to the
overall terrorist scheme would still be insufficiently

"substantial" to warrant aiding and abetting liability.

## 2. *Physical Injuries*

Defendant claims that all of plaintiffs' claims must fail because plaintiffs have failed to allege they were "injured in [their] person, property or business," as required by § 2333(a). Plaintiffs in their complaint claim damages stemming from the emotional and pecuniary injuries resulting from Mr. Goldberg's death. Whether their claims may proceed thus depends on whether an emotional injury of the sort they allege may qualify as an injury to "person, property or business" within the meaning of § 2333(a).

The history and structure of the statute suggest that Congress intended to include non-physical injuries in the phrase "injured in [their] person." It would make little sense for Congress to have intended that U.S. nationals "could recover for losses of property yet not losses of family members." *Linde*, 384 F. Supp. 2d at 589. In fact, every court that has construed § 2333(a) has reached the same conclusion. *See, e.g.*, *Linde* at 589 ("In the absence of any limiting language in the statute, the court will not limit the scope of section 2333(a) to physical injuries"); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 181-82 (D.D.C. 2004) ("The [ATA] does not

specifically require that a plaintiff suffer *physical* harm prior to filing suit."); *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19 (D.D.C. 2007) (same). Accordingly, I decline to dismiss plaintiffs' claims due to the lack of a physical injury.

*3.  Whether the Complaint Alleges the Defendant Committed an "Act of International Terrorism"*

Plaintiffs' second claim alleges that defendant is liable for knowingly providing financial services to Hamas in violation of section 2339(B)(a)(1), that such a violation constitutes an "act of international terrorism" as defined in § 2331, and that consequently defendant is civilly liable to plaintiffs under § 2333(a).  At issue is whether a violation of § 2339 suffices to qualify as an act of international terrorism; defendant argues it does not.

There exists a "chain of explicit statutory incorporations by reference," (*Boim III*, at 690-91), from sections 2333(a) to 2331(1), to 2339B and 2339C as follows:  18 U.S.C. § 2333 provides a civil cause of action to any national of the United States injured "by reason of an act of international terrorism." 18 U.S.C. § 2331 in turn defines international terrorism as activities that:

(A) involve violent acts or acts dangerous to human life

that are a violation of the criminal laws of the United
States or of any State, or that would be a criminal
violation if committed within the jurisdiction of the United
States or of any State;

(B) appear to be intended--

    (i) to intimidate or coerce a civilian population;

    (ii) to influence the policy of a government by
    intimidation or coercion; or

    (iii) to affect the conduct of a government by mass
    destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of
the United States, or transcend national boundaries in terms
of the means by which they are accomplished, the persons
they appear intended to intimidate or coerce, or the locale
in which their perpetrators operate or seek asylum.

§ 2339B criminalizes the act of providing material support

or resources to designated foreign terrorist organizations.

The final link in the chain is that a violation of §

2339B(a)(1) qualifies as an act of international terrorism for

the purposes of § 2333(a).  Defendant is simply incorrect in

asserting that no court has held that a § 2339B violation

satisfies each of the prongs of 18 U.S.C. § 2331; indeed this

court has so held.  *Strauss v. Credit Lyonnais, S.A.*, 2006 WL

2862704 at *1 (E.D.N.Y. 2006) ("[v]iolations of 18 U.S.C. § 2339B

and § 2339C are recognized as international terrorism under 18

U.S.C. § 2333(a)."); *Weiss v. National Westminster Bank PLC*, 453

F. Supp. 2d 609, 613 (E.D.N.Y. 2006) (same).  *See also Almog v.

Arab Bank, PLC*, 471 F. Supp. 2d 257, 268 (E.D.N.Y. 2007)

("violations of sections 2339A, 2339B(a)(1), and 2339C can serve
as predicate crimes giving rise to liability under the ATA");
*Boim II*, 291 F.3d at 1015 ("If the plaintiffs could show that
[the defendants] violated either section 2339A or section 2339B,
that conduct would certainly be sufficient to meet the definition
of 'international terrorism' under sections 2333 and 2331.").
Accordingly, I conclude that plaintiffs have sufficiently alleged
that defendant USB committed acts of international terrorism.

*4.   Knowledge and Intent Requirement*

     Defendant argues that plaintiffs haven't pled the required
level of knowledge and intent for a section 2333(a) violation.
The question is what sort of intent is required; plaintiffs
certainly do not allege that defendant UBS was aware that its
wire transfers would ultimately go to suicide bomber Ali Ju'ara,
or that UBS actually intended to assist Hamas in its terrorist
agenda.  Plaintiffs argue that neither of those is required.

     The level of scienter required is different for each of the
underlying statutory violations that plaintiffs allege give rise
to section 2333(a) liability: section 2339B, the basis for
plaintiffs' third claim, has a "specific intent requirement,
requiring "knowledge or intent that the resources given to
terrorists are to be used in the commission of terrorist
attacks." *Linde*, 384 F. Supp. 2d at 586 n.9.  However, it does

not require "the specific intent to aid or encourage the particular attacks that injured plaintiffs." *Id.*

In section 2339B, however, Congress omitted the intent requirement. *Strauss*, 2006 WL 2862704, at *13. It thus requires only "knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged in terrorism." *Linde*, 384 F. Supp. 2d at 586 (citing Congress's December 2004 amendment to section 2339B, PL 108-458, 118 Stat 3638 (December 17, 2004).[16]

However, irrespective of which statute (§ 2339B or § 2339C) provides the basis for a finding that defendant engaged in international terrorism, plaintiffs must still meet the scienter requirements of § 2333(a) itself in order to hold defendant liable under that statute. *Boim II*, 291 F.3d at 1016 ("We are using sections 2339A and 2339B *not* as independent sources of liability under section 2333, but to amplify what Congress meant by 'international terrorism,'"). I therefore turn to the intent requirements of § 2333(a).

While 18 U.S.C. § 2333(a) does not contain an explicit *mens*

---

[16] Though the amendment occurred after the wire transfers at issue in this case, it merely clarified the *mens rea* requirement in the statute, and thus there is no issue regarding whether the amendment is retroactive in effect. *See Linde,* 384 F. Supp. 2d. At 587 n.10 (noting the amendment did not change the *mens rea* requirement of § 2339B, but merely provided clarification on Congress's original intent.)

*rea* requirement, courts have interpreted the statute to include a requirement that there be some deliberate wrongdoing by the defendant, in light of the fact that the statute contains a punitive element (i.e. treble damages). As *Boim III* held, 549 F.3d at 692:

> "Punitive damages are rarely if ever imposed unless the defendant is found to have engaged in deliberate wrongdoing. . . . .There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."

(citing W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 2, pp. 9-10 (5th ed. 1984)). It is this category that is of particular relevance here: conscious and deliberate disregard of the interest of others, in the face of a known risk, can qualify as sufficiently deliberate wrongdoing. Plaintiffs need not show that the defendant in fact knew its actions would further terrorism. Rather, it is sufficient to show that it knew the entity had been designated as a terrorist organization, and deliberately disregarded that fact while continuing to provide financial services to the organization with knowledge that the services would in all likelihood assist the organization in accomplishing its violent goals. *Boim III*, 549 F.3d at 692-94 (comparing intent requirement to that required for criminal negligence).

Here, plaintiffs have sufficiently pled that the defendant
consciously disregarded the fact that it was supporting a
terrorist organization, despite a strong probability that the
bank's services would be used to further the organization's
terrorist activities.  According to plaintiffs' allegations, the
defendant's client, ASP, was designated as a SDGT by President
Bush in August of 2003.  ASP was placed on the OFAC list at that
time because it was found to be engaging in large-scale
fundraising for Hamas.  Compl. ¶¶ 63-67.  Hamas itself had been
designated a terrorist organization by the United States
Government since at least 1995, Compl. ¶ 28.  ASP's parent
organization, CBSP, has also been designated a SDGT.  Compl. ¶
59.  Numerous other publicly available sources of information
suggested that ASP was funneling money to terrorist
organizations,[17] and that the organization to which defendant UBS
transferred the funds, the Tulkarem Charity Committee, was
affiliated with terrorist organizations and funneled money to
Hamas.  At least one prominent member of the Tulkarem Charity
Committee is alleged to have appeared in public in the name of
Hamas.  Compl. ¶ 79.  Additionally, the Israeli Government is
alleged to have declared the Tulkarem Zakat Committee an

---

[17] For instance, in 2002, the Palestinian Authority froze wire transfers
from ASP and CBSP's chairman and director to a Hamas-controlled "charity."
Compl. ¶ 62. In addition, the head of the Union of Good, an umbrella
organization of which ASP is a member, made public statements authorizing
suicide bombings against Israel. Compl. ¶ 55.

"unlawful organization" in February 2002 explicitly because of
its connection to Hamas.  Compl. ¶ 80; Declaration of Daniel L.
Cantor, Esq., Exhibit 8 (certified translation of excerpts from
Israel's official gazette, *Yalkut Hapirsumim,* date March 7, 2002)
(declaring as "unlawful organizations" certain groups which
"belong to the Hamas. . . or which support the infrastructure of
Hamas" including the Tulkarm [sic] Charity Committee).

The parties dispute whether defendant UBS is a licensed
financial institution in Israel so that the Israeli government's
designation of Tulkarem Zakat as an "unlawful organization" would
have constituted constructive notice to UBS.  But that fact is
not indispensable; plaintiffs have pled sufficient facts from
which it could be reasonably inferred that the defendant had
actual knowledge of the ties of their client ASP and the
recipient of the transfers, Tulkaren Zakat, to Hamas, and would
in all likelihood use their services to further terrorist
activities.

*5.  Causation*

Defendant argues that plaintiffs haven't sufficiently pled
that their injuries were caused by defendant's conduct for three
reasons: (1) plaintiffs fail to allege particularized facts from
which it may be inferred that UBS's wire transfers were a
"substantial factor" in causing the Bus 19 attack; (2) the attack

wasn't a reasonably foreseeable consequence of those wire transfers; and (3) the terrorist attack was in fact carried out by a terrorist group unrelated to Hamas, and thus had no causal connection to the wire transfers that UBS allegedly facilitated.

The relevant causation requirement has been derived from the language in 18 U.S.C. § 2333 authorizing any national of the United States to sue where he or she was "injured in his or her person, property, or business by reason of an act of international terrorism."  The words "by reason of" have been interpreted to express Congress's intent to require a showing of proximate causation.  See *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265-68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (interpreting identical "by reason of" language in civil RICO provision to require a showing that defendant's conduct proximately caused plaintiff's injury).

A showing of proximate causation requires that plaintiffs show defendant's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank*, N.A., 318 F.3d 113, 123 (2d Cir. 2003). Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the

plaintiff.  Such a burden would render the statute powerless to
stop the flow of money to international terrorists, and would be
incompatible with the legislative history of the ATA.  *See, e.g.*,
S. Rep. No. 102-342 at 22. ("Noting that Congress intended to
impose "liability at any point along the causal chain of
terrorism.").  As the Ninth Circuit has noted, "money is
fungible; giving support intended to aid an organization's
peaceful activities frees up resources that can be used for
terrorist acts." *Weiss*, 453 F. Supp. 2d at 631 (quoting
*Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir.
2000).  Consequently, as I have held before, "[t]aking into
account the legislative history of these statutes and the purpose
behind them,[] it is clear that proximate cause may be
established by a showing only that defendant provided material
support to, or collected funds for a terrorist organization which
brought about plaintiffs' injuries. *Strauss*, 2006 WL 2862704 at
*18; *Weiss*, 453 F. Supp. 2d 631-32 (same).

The plaintiffs here have sufficiently pled such a causal
nexus.  Specifically, they have alleged that the defendant
transferred funds from a designated terrorist organization, ASP,
to Tulkarem Zakat, an organization controlled by Hamas in the
West Bank territory, Compl. ¶ 76.  They have also identified
three specific transfers to Tulkarem Zakat, the last of which
occurred a few weeks before the terrorist bombing that killed

Stuart Scott Goldberg.  Compl. ¶ 73-75.  In addition, they have

allege with specificity that Hamas, an organization claimed to

control Tulkarem Zakat, was responsible for the bombing of Bus

19.  Plaintiffs have thus sufficiently pled that defendant's

conduct was a substantial cause of their injuries.  For the same

reason, the ultimate harm was foreseeable.  A fact finder could

plausibly find that it was entirely foreseeable that transmitting

money to a terrorist organization would lead to violence and

Congress had precisely that lethal connection in mind in passing

the ATA.

Finally, defendant argue that members of the terrorist group

Tanzim Fatah, an organization unrelated to Hamas, were in fact

the perpetrators of the Bus 19 attack, and "[t]hus, even if the

approximately $25,000 (the dollar equivalent of 31,270 Swiss

francs) that ASP sent to Tulkarem Charity Committee ended up with

Hamas, the Bus 19 Attack cannot in any manner be traced to those

funds."[18]  Def. Repl. Br. at 18-19.  While plaintiffs will need

to establish at trial Hamas's responsibility for the Bus 19

attack, at this stage all they must do is plausibly allege it.

*See, e.g.*, *Linde*, 384 F. Supp. 2d at 581 n.7.  ("If, at trial,

plaintiffs fail to prove that these acts were terror attacks,

---

[18]  Defendant notes that in a separate lawsuit, plaintiffs alleged that
the Bus 19 attack perpetrator was an employee and agent of the PLO
[Palestinian Liberation Organization] and the PA [Palestinian Authority]."
Def. Br. at 2.  However, plaintiffs here allege that members of more than one
terrorist group were involved in planning and executing the attack.

rather than "mere" street crime, they will have failed to establish a claim under the ATA. However, at this stage of the litigation, dismissing these claims would be premature."). I conclude that plaintiffs' complaint adequately pleads Hamas' responsibility for the bombing of Bus 19. Moreover, defendant's interpretation of the Israeli Military Court's indictment against Nafal Adawin (which the Complaint incorporates by reference) as demonstrating that Tanzin Fata -- not Hamas -- was responsible for the bombing, is not the only reasonable interpretation of the indictment. The indictment may in fact be interpreted to state that both groups share responsibility. Indeed, the Israeli indictment appears to allege that Adawin, a Hamas operative, was the source of the original idea for the attack, recruited the suicide bomber Ali Ju'ara to perpetrate the attack on behalf of Hamas, personally filmed Ju'ara wearing an explosive device, and later sent that footage to a television station claiming responsibility for the bombing on behalf of Hamas. Indictment at 10-12. Plaintiffs have thus plausibly pleaded a causal connection tying defendant's wire transfers to the ultimate harm.

*6. Plaintiffs' Claims Under Sections 2339B and 2339C*

The final ground on which defendant urges dismissal of the complaint is that plaintiffs haven't adequately alleged that UBS violated § 2339B and § 2339C. This argument presents two issues:

whether there is a constitutional or jurisdictional bar to §
2339B and § 2339C's application to defendant UBS's alleged
conduct; and, secondarily, if the answer to the first question is
"yes," has plaintiff sufficiently alleged a violation of those
statutes?

Defendant argues § 2339B and § 2339C cannot be
constitutionally applied to UBS's alleged conduct because there
is an insufficient nexus tying their conduct to the jurisdiction
of the United States. "It is beyond doubt that, as a general
proposition, Congress has the authority to 'enforce its laws
beyond the territorial boundaries of the United States.'" *United
States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC v.
Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113
L.Ed.2d 274 (1991). However, Congressional intent that a statute
apply to conduct outside of the territorial jurisdiction of the
United States must be clear; in the absence of clear intent there
is a presumption against such extraterritorial application.
*Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed.
680 (1949); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155,
188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *United States v.
Gatlin*, 216 F.3d 207, 211 (2d Cir. 2000).

Moreover, even where Congressional intent is clear, the Due
Process Clause of the Fifth Amendment limits Congress's power to
regulate foreign entities' conduct outside of the United States

and requires a "sufficient nexus" between the conduct and the United States' interest so that applying U.S. law "would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 111; *See also United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983).

Congress, however, clearly intended the ATA have extraterritorial application; 18 U.S.C. § 2333 provides civil remedies for victims of "international terrorism" and 18 U.S.C. § 2331 explicitly defines that term to include acts which occur primarily outside the territorial jurisdiction of the United States. Thus the only question is whether defendant's alleged conduct was "so unrelated to American interests as to render their [being sued] in the United States arbitrary or fundamental unfair." *Yousef*, 327 F.3d at 112. There can be no dispute that combating international terrorism is a paramount interest of the United States: "international terrorism is a serious and deadly problem that threatens the vital interests of the United States." Pub. L. No. 104-132 § 301(a)(1)& 7, 110 Stat. 1250 (1996), *reprinted in* 18 U.S.C. § 2339B, note. In order to see why that is so, it is necessary to look no further than the plausible allegations in the complaint in this case, in which a terrorist attack in Israel is said to have had immediate and grave consequences for a family of United States citizens, who lost their father and spouse. Moreover, there is nothing

fundamentally unfair about requiring UBS, a large and
sophisticated company which maintains a full-time active presence
in the United States, to comply with United States law. *See
United States v. Al Kassar*, 582 F. Supp. 2d 488, 494 (S.D.N.Y.
2008) (explaining purpose behind the Due Process nexus
requirement is to "ensure[] that a United States court will
assert jurisdiction only over a defendant who should reasonably
anticipate being haled into court in this country."). There is
accordingly no Due Process bar to 18 U.S.C. § 2339B and § 2339C's
application to defendant UBS's conduct here.

Defendant also contends that jurisdiction is lacking under
18 U.S.C. § 2339B and § 2339C because those statutes apply only
to natural persons "found in the United States," and not to
corporations. This contention must be rejected. As plaintiffs
note, had Congress limited sections § 2339B and § 2339C to
natural persons, individuals could evade both criminal and civil
liability for supporting terrorism through the simple act of
incorporation. Moreover, neither legislative history case law or
reason provide an indication that the statute was intended to be
limited to natural persons.

I turn to whether plaintiffs have pled sufficient facts to
state claims for § 2339B and § 2339C violations.

*a. § 2339B*

Defendant argues that plaintiffs cannot show that § 2339B was violated because cannot plausibly allege defendant UBS provided support for a "foreign terrorist organization;" an express requirement for liability under § 2339B.[19]

Since it is undisputed that neither defendant's client, ASP, nor the recipient of the funds, Tulkaren Zakat, was ever formally designated as an FTO, the issue is whether defendant either (1) had knowledge that the ultimate beneficiary was an FTO, or (2) either of the entities to which defendant provided direct support, ASP or Tulkaren, can be said to have been acting as agents of Hamas (which was and is an FTO).

As this court explained in *Strauss*, 2006 WL 2862704 at *10-11, liability may be found under § 2339B even where support wasn't provided directly to an FTO. Such a circumstance may be found where an entity provides support to an alias or agent of an FTO. In *National Council of Resistance of Iran v. Department of*

_____

[19] Section 2339B(a)(1) provides:

"Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism."

Classification as a "foreign terrorist organization" requires that the organization be designated as such by the by the United States Secretary of State in accordance certain procedures. The designation lasts for a period of two years unless renewed. INA Section 219 (8 U.S.C. § 1189).

*State*, 373 F.3d 152 (D.C. Cir. 2004) the D.C. Circuit clarified
the sort of relationships that would justify a transfer of FTO
status from one organization to another:

> Just as it is silly to suppose "that Congress empowered the
> Secretary to designate a terrorist organization ... only for
> such periods of time as it took such organization to give
> itself a new name, and then let it happily resume the same
> status it would have enjoyed had it never been designated"
> NCRI, 251 F.3d at 200, so too is it implausible to think
> that Congress permitted the Secretary to designate an FTO to
> cut off its support in and from the United States, but did
> not authorize the Secretary to prevent that FTO from
> marshaling all the same support via juridically separate
> agents subject to its control. For instance, under NCRI's
> conception, the Government could designate XYZ organization
> as an FTO in an effort to block United States support to
> that organization, but could not, without a separate FTO
> designation, ban the transfer of material support to XYZ's
> fund-raising affiliate, FTO Fundraiser, Inc. The crabbed
> view of alias status advanced by NCRI is at war not only
> with the antiterrorism objective of AEDPA, but common sense
> as well.

*Id.* at 157-158.  Thus, the Court held that "ordinary principles
of agency law are fairly encompassed by the alias concept under
AEDPA," *id.* at 157, and that "the requisite relationship for
alias status is established at least when one organization so
dominates and controls another that the latter can no longer be
considered meaningfully independent from the former." *Id.* at
158.  Factors to be considered include whether the organizations
share leadership, *id.* at 159, whether they commingle finances,
publications, offices, etc., *id.*, and whether one operates as a
division of the other. *NLRB v. Deena Artware, Inc.*, 361 U.S.
398, 403 (1960).

In addition, a violation of § 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO. For instance, in *U.S. v. Rahmani*, 209 F. Supp. 2d 1045 (C.D. Cal. 2002) the Central District of California upheld an indictment charging defendants with providing material support to a designated Foreign Terrorist Organization, despite the fact that the funds were not provided directly to any FTO. The court held that it was sufficient that the indictment charged "that the ultimate destination of the solicited funds was a designated foreign terrorist organization," and that defendants were aware of the ultimate beneficiaries. *Rahmani*, 209 F. Supp. 2d at 1052, *rev'd sub nom. on separate grounds*, *United States v. Afshari*, 426 F.3d 1150 (9th Cir. 2005).

Plaintiffs here have plausibly alleged that ASP acted as an fundraising agent of Hamas. The Complaint alleges that: (1) ASP is the primary fundraiser for Hamas in Switzerland (Compl. ¶ 64) (2) ASP collects large amounts of money from mosques and Islamic centers and transfers that money to sub-organizations of Hamas (*id.*); (2) ASP provides financial support for Hamas (Compl. ¶ 61); (3) OFAC issued a "Blocking Notice" freezing all of ASP's funds, accounts, and real property because of its association with Hamas (Compl. ¶ 68); (4) ASP transferred funds to organizations belonging to Hamas's financial infrastructure (Compl. ¶¶ 71, 76); (6) the Board of Directors of ASP's umbrella

organization, the Union of Good, includes three senior Hamas
figures (Compl. ¶ 50); and (7) the Chairman of ASP has made wire
transfers to a well-known Hamas front (Compl. ¶ 62).

Plaintiffs have also plausibly alleged that UBS violated §
2339B through UBS's knowledge that the ultimate beneficiary of
its wire transfers was Hamas, an FTO.  Plaintiffs cite to public
sources of information on both ASP and Tulkarem Zakat which
plausibly could have informed UBS of that fact.  The Complaint
alleges that in designating ASP as an SDGT in August of 2003,
President Bush noted that the designation was due to ASP's
provision of financial support to Hamas.  Compl. ¶ 64.  In
addition, Khalid Muhammad Ahmad Al-Shuli, the current chairman
and director of CBSP and ASP's current chairman, is alleged to
have ties to Hamas, Compl. ¶ 60, and in January of 2002, the
Palestinian Authority froze wire transfers from Al-Shuli to a
charity that plaintiffs describe as a well-known Hamas front, Al-
Mujama al-Islami, because of its connections to Hamas.  Compl. ¶
62. The charity had been established by the Sheik Ahmed Yassin,
the founder of Hamas.  Compl. ¶ 21, 62.  Both ASP and its parent
organization CBSP are members of the Union of Good, which serves
as the principal fundraising mechanism for Hamas and is headed by
a number of senior Hamas figures. Compl. ¶¶ 46, 50.  According to
the Complaint, the Tulkaren Zakat Committee serves as part of the
worldwide support system of Hamas's operational-terrorist wing.

Compl. ¶ 78.  The Israeli Government, in declaring the Tulkarem
Zakat Committee an "unlawful organization" in February 2002
stated that Tulkarem was among the organizations that "belong to
the Hamas Organization or which support the infrastructure of
Hamas."  Tulkarem Zakat is alleged to be headed by a Hamas
terrorist.  Plaintiffs have thus sufficiently pled that UBS
knowingly provided financial support to a FTO, Hamas.


*b.  § 2339C*

     Defendant UBS's final contention is that plaintiffs have
failed to sufficiently plead that UBS acted "knowingly" in
providing funds to an FTO as required by § 2339C.  But plaintiffs
have clearly pled that the defendant was aware of the terroristic
purposes of ASP, Tulkarem Zakat and Hamas.  As discussed above,
Congress couldn't have required that plaintiffs establish that
the *very dollars* sent to a terrorist organization were used to
purchase the implements of violence that caused harm to the
plaintiff.  Providing funds to an organization known to be
engaged in violent acts of terrorism is sufficient to establish
defendant's knowledge that the funds provided would be used in
whole or in part for terrorist activities.  *Strauss*, 2006 WL
2862704 at *17.  Plaintiffs have sufficiently alleged that
defendant UBS was aware that ASP and Tulkarem were controlled by
or provided money to Hamas, and that Hamas is a designated FTO.

They have thus met their burden in demonstrating UBS acted knowingly under section 2339C.

**CONCLUSION**

For the reasons set forth above, defendant's motion to dismiss is granted with respect to plaintiffs' first claim, and denied in all other respects.  The Clerk is directed to provide a copy of the within to the attorneys for both sides.

SO ORDERED.

Dated:     Brooklyn, New York
           September 24, 2009


                    By: /s/ Charles P. Sifton (electronically signed
                            United States District Judge