UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
Karen Goldberg, Chana Goldberg, Esther
Goldberg, Yitzhak Goldberg, Shoshana
Goldberg, Eliezer Goldberg, Yaakov
Moshe Goldberg and Tzvi Yehoshua
Goldberg,

        Plaintiffs,               <u>MEMORANDUM AND ORDER</u>

  -against-                 Civil Action No.
                                      CV-08-375 (DGT)
UBS AG,

        Defendant.
---------------------------------------X
Trager, J:

     Plaintiffs Karen Goldberg and her seven children, Chana

Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg,

Eliezer Goldberg, Yaakov Moshe Goldberg and Tzvi Yehoshua

Goldberg, commenced this action against defendant bank UBS AG

("UBS") on January 28, 2008.  Plaintiffs bring claims under the

civil remedy provisions of the Anti-Terrorism Act ("ATA"), 18

U.S.C. § 2333(a)[1] alleging that UBS is liable for: (1) aiding and

abetting the murder or attempted murder of a United States

citizen or causing the commission or attempted commission of

physical violence upon United States Citizens in violation of 18

U.S.C. § 2332(a)-(c)[2] and 18 U.S.C. § 2333(a); (2) committing

---

[1] 18 U.S.C. § 2333(a) provides that "[a]ny national of the United States
injured in his or her person, property, or business by reason of an act of
international terrorism, or his or her estate, survivors, or heirs, may sue
therefor in any appropriate district court of the United States and shall
recover threefold the damages he or she sustains and the cost of the suit,
including attorney's fees."

[2] 18 U.S.C. § 2332(a)-(c) provide criminal penalties for the killing or
conspiracy to kill "a national of the United States, while such national is
outside the United States," and for "whoever outside the United States engages
in physical violence . . . with the result that serious bodily injury is

acts of international terrorism in violation of 18 U.S.C. §

2339B(a)(1)[3] and 18 U.S.C. § 2333(a); and (3) collecting and

transmitting funds on behalf of a terrorist organization in

violation of 18 U.S.C. § 2339C[4] and 18 U.S.C. § 2332(a).

On November 3, 2008, defendant UBS moved to dismiss

plaintiffs' Complaint on grounds of (1) lack of standing; (2)

forum non conveniens; (3) unconstitutionality of the ATA[5] as

applied to UBS's conduct; and (4) failure to satisfy the pleading

standards of Federal Rule of Civil Procedure 8.  By Order dated

---

caused to a national of the United States."

[3] 18 U.S.C. § 2339B(a)(1) provides criminal and civil penalties for "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so," and requires that "[t]o violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . .that the organization has engaged or engages in terrorist activity . . .or that the organization has engaged or engages in terrorism."

[4] 18 U.S.C. § 2339C provides criminal and civil penalties for whoever "by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out . . . [an act] intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

[5] The Anti-Terrorism Act of 1990 ("ATA") comprises §§ 2332-2338 of title 18 of the U.S. Code, excluding sections 2332a-h.  The Act was enacted in 1990, repealed for technical reasons in 1991 and reenacted virtually unchanged as part of the Federal Courts Administration Act of 1992.  See Pub. L. No. 102-572, § 1003, 106 Stat. 4506, 4521-24 (1992).  The related provisions in § 2332a-h and §§ 2339-2339D were enacted by various other laws, including the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  For simplicity's sake, this opinion refers to all of these provisions collectively as "the ATA."

September 24, 2009 ("the September 24th Order"), Judge Sifton[6] granted defendant UBS AG's motion to dismiss the first count of plaintiffs' Complaint (aiding and abetting a violation of 18 U.S.C. § 2332)[7], and denied the motion in all other respects.

Two motions are currently pending before this court. On October 8, 2009, defendant UBS moved for reconsideration of the portion of Judge Sifton's September 24, 2009 Order declining to dismiss plaintiffs' Complaint on forum non conveniens grounds. On October 21, 2009, defendants moved to certify the September 24th Order for interlocutory appeal. For the reasons set forth below, both motions are denied.

## BACKGROUND

Familiarity with the factual background of this matter is presumed based on the record of proceedings before Judge Sifton. For a description of the facts of this case, see Goldberg v. UBS AG, 660 F. Supp. 2d 410 (E.D.N.Y. 2009).

---

[6] This matter was originally assigned to the late Judge Charles P. Sifton. It was transferred to the undersigned on November 24, 2009.

[7] Judge Sifton dismissed the first count of the Complaint, concluding that, even assuming aiding and abetting liability was available under the ATA, plaintiffs had failed to sufficiently plead such a claim because: (1) 18 U.S.C. §2332 was inapplicable as the deceased victim, Stuart Goldberg was not a "national of the United States"; and (2) plaintiffs had not pled facts sufficient to show "substantial assistance" as required for aiding and abetting liability. Goldberg, 660 F. Supp. 2d at 425-27.

## DISCUSSION

## (1)

## Motion for Reconsideration

**a.    Standard for Reconsideration**

Civil motions for reconsideration in this District are governed by the analogous standards imposed by Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3. <u>U.S. v. James</u>, No. 02 CV 0778, 2007 WL 914242, at *3 (E.D.N.Y. Mar. 21, 2007). "The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." <u>Shrader v. CSX Transp.</u>, 70 F.3d 255, 257 (2d Cir. 1995). Reconsideration is also appropriate if there is an intervening change of controlling law, new evidence or the need to correct a clear error or prevent manifest injustice. <u>Doe v. New York City Dep't of Social Servs.</u>, 709 F.2d 782, 789 (2d Cir. 1983); <u>Bay Casino, LLC v. M/V Royal Empress</u>, No. 98-CV-2333 (SJ), 1998 WL 566772, at *1 (E.D.N.Y. Aug. 21, 1998).

Local Civil Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered. <u>See</u> <u>Caleb & Co. v. E.I. Du Pont</u>

De Nemours & Co., 624 F. Supp. 747, 748 (S.D.N.Y. 1985).  In

deciding a Local Rule 6.3 motion, courts will not allow a party

to use the motion as a substitute for an appeal from a final

judgment.  See Morser v. A.T. & T. Info. Sys., 715 F. Supp. 516,

517 (S.D.N.Y. 1989); Korwek v. Hunt, 649 F. Supp. 1547, 1548

(S.D.N.Y. 1986).  Accordingly, a party in its motion for

reconsideration "may not advance new facts, issues or arguments

not previously presented to the court."  Litton Indus., Inc. v.

Lehman Bros. Kuhn Loeb, Inc., No. 86-CV-6447 (JMC), 1989 WL

162315, at *3 (S.D.N.Y. Aug. 4, 1989).


**b.  Merits of Motion for Reconsideration**

Defendant UBS seeks reconsideration of Judge Sifton's denial

of defendant's motion to dismiss on forum non conveniens ("FNC")

grounds in the September 24th Order.  Defendant principally

contends reconsideration is warranted because Judge Sifton

"overlooked [his] own ability to eliminate [] distinctions

between the ATA and Israeli law," and "could have conditioned FNC

dismissal on UBS stipulating that, if liability were established,

Plaintiffs would be entitled to prove and recover emotional and

non-economic damages akin to an award for 'loss of consortium'

under U.S. law."[8]  Defendant's Motion for Reconsideration ("Def.

---

[8] At oral argument on December 29, 2009, counsel for defendant conceded
that an Israeli court would apply Israeli law to the instant dispute.  Tr. at
14.

Rec. Br.") at 2.

Defendant specifically challenges the conclusion in the September 24th Order that UBS had not met its burden of showing that the proposed alternate forum, Israel, offers a remedy which is "substantially the same" as the one available in the U.S.[9]

In the September 24th Order, Judge Sifton held that dismissal on FNC grounds was not warranted because there were at least two significant differences between the remedies available under Israeli and U.S. law: (1) while the ATA permits successful plaintiffs to recover treble damages plus the cost of bringing suit, including attorneys fees, Israeli law contains no provision for treble damages; and (2) Israel law lacks a mechanism by which plaintiffs could obtain compensation for their emotional or non-economic injury.[10]  Id. at 9.  Because defendant

---

[9] 18 U.S.C. § 2334(d) provides that:

The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless-

(1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;
(2) that foreign court is significantly more convenient and appropriate; and
(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

[10] Both parties assume that non-economic damages (including emotional harm and loss of solatium) are available in a suit brought under the ATA. This assumption rests on the belief that the legislative history and language of the ATA "evidence[] an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." (Plaintiffs' Opposition to Defendant's Motion to Dismiss at 18 (citing Boim v. Quranic Literary Inst. And Holy Land Found. for Relief and Dev., 291 F.3d 1000, 1010 (7th Cir. 2002))); see also

Transcript of Oral Argument dated Dec. 29, 2009 ("Tr.") at 2. However, looking to "traditional tort law" in the instant case is not necessarily determinative, since it is far from uniform on the availability of loss of solatium damages. For example, New York law does not permit such damages in wrongful death cases, <u>Liff v. Schildkrout</u>, 49 N.Y.2d 622, 404 N.E.2d 1288 (1980), although the number of states that share that view appears to be shrinking. <u>See, e.g.</u>, 22A Am. Jur. 2d <u>Death</u> § 223 (2009) ("The modern trend . . . is to allow damages for the loss of companionship and society, or consortium."); William Lloyd Prosser &, W. Page Keeton, <u>Prosser and Keeton on Torts</u> 953 (5th ed. 1984) ("The decisions and statute of recent years have moved in the direction of increased support of the recovery of intangible losses and for some degree of protection for the bereavement of survivors."); Dan Dobbs, <u>The Law of Torts</u> 812 (2001) (same). In recognition of the growing consensus among the states and the "humanitarian policy of the maritime law," the Supreme Court recognized loss of solatium damages in crafting federal common law to govern maritime actions, <u>Sea-Land Services, Inc. v. Gaudet</u>, 414 U.S. 573, 587 n.17, 94 S.Ct. 806 (1974), although the availability of non-pecuniary damages in maritime actions is generally limited by statute. <u>See Miles v. Apex Marine Corp.</u>, 498 U.S. 19, 20 (1990). Whether such emotional damages are recoverable under the ATA thus depends on what substantive law will govern the calculation of damages under choice of law principles.

"[T]he law is unsettled when it comes to applying either a federal common law choice of law rule or state choice of law principles in non-diversity cases," <u>Pescatore v. Pan American World Airways, Inc.</u>, 97 F.3d 1, 12 (2d Cir. 1996), although both reach the same result in the present case. Because Israel is both the locus of the injury and the domicile of the plaintiffs, Israeli law, which does not provide for loss of solatium damages, would govern damages in this suit, unless doing so would conflict with a strong federal interest. <u>See, e.g.</u>, <u>Corporacion Venezolana de Fomento v. Vintero Sales Corp.</u>,629 F.2d 786 (2d Cir. 1980) (applying federal choice of law analysis); <u>Schoenberg v. Exportadora de Sal, S.A. de C.V.</u> 930 F.2d 777, 783 (9th Cir. 1991) (following Restatement approach that a presumption that the law of the place where the injury occurred applies law in federal question cases); <u>O'Melveny & Myers v. FDIC</u>, 512 U.S. 79, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) ("the normal federal disposition is for a federal court to apply the relevant state's law as the federal rule of decision absent a 'significant conflict between some federal policy or interest and the use of state law.'") (citation omitted); <u>Barkanic v. General Admin. of Civil Aviation of the People's Republic of China</u>, 923 F.2d 957 (2d Cir. 1991) (applying New York choice of law principles in FSIA action and selecting Chinese law, which strictly limited damages in aviation cases).

The history of the ATA evidences congressional intent that non-pecuniary damages be available in a suit under the ATA. For instance, during hearings in 1990 on the provision that became Section 2333(a), former Justice Department official Joseph A. Morris explained that "American victims seeking compensation for physical, psychological, and economic injuries naturally turn to the common law of tort. American tort law in general would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments." Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990), at 83. The hearings also indicate that the ATA was intended "to make certain the ability of family members to file a lawsuit on behalf of a slain or injured relative." <i>Id.</i> at 46 (Statement of Senator Thurmond). In addition, the ATA's failure to include any language explicitly limiting a plaintiff's remedy to pecuniary damages is strongly suggestive of congressional intent that loss of solatium damages be

offered to enter into a stipulation trebling any compensatory
damage award determined by an Israeli court, Judge Sifton
concluded that defendant had mitigated any effect of the first of
these two distinctions, but that the latter distinction precluded
the grant of FNC dismissal. Id. Defendant now contends that
Judge Sifton overlooked the possibility of conditioning FNC
dismissal on defendant UBS's agreement to have an Israeli court
determine and award damages for solatium or loss of consortium.[11]
Defendant's argument fails for three reasons.

First, by failing to timely raise such an argument during
the briefing of its motion to dismiss, defendant waived its right
to seek reconsideration on this point. The suggestion of
conditioning FNC dismissal on defendant's stipulating to solatium
or loss of consortium damages was raised nowhere in defendant's

---

available given the growing consensus among the states to allow such damages.
Finally, § 2334(d)'s assurance that ATA actions would not be dismissed in
favor of a jurisdiction with less favorable remedies suggests congressional
intent to allow broad remedies under U.S. law, because "the deterrent effect
of the legislation will be maximized if it is interpreted to subject
terrorists to the broadest possible range of damages." Estates of Ungar ex
rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232, 267 (D.R.I.
2004). Application of Israeli law would thus contravene Congress' implied
intent (evident in the ATA's language and history, and particularly in its
unique FNC provision) to ensure that plaintiffs could recover the full range
of remedies under United States tort law. Accordingly, it seems that Congress
intended that damages under the ATA be calculated by reference to federal
common law, consonant with federal maritime common law, to include such loss
of solatium damages. See In re Gaston & Snow, 243 F.3d 599, 607 (2d Cir.
2001) ("[A]pplication of a federal rule is not foreclosed by Erie where there
is a significant federal interest.").

[11] The term "loss of consortium" includes "such elements as love,
companionship, affection, society, sexual relations, solace and more."
Battista v. U.S., 889 F. Supp. 716, 729 (S.D.N.Y. 1995) (citing Millington v.
Southeastern Elevator Co., 22 N.Y.2d 498, 293 N.Y.S.2d 305, 308 (N.Y. 1968)).
"Solatium" refers to damages attributable to mental anguish. See Knox v.
Palestine Liberation Organization, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).

85 pages of briefing on its motion to dismiss, or in the two
declarations of its Israeli law expert, which contained 117
numbered paragraphs spanning 41 pages (excluding exhibits).  It
was also not mentioned in any communication to the court,
including defendant's August 13, 2008 letter "to supplement" its
motion to dismiss, and defendant does not allege that this option
was raised with plaintiffs' counsel prior to the September 21,
2009 oral argument.[12]  Rather, defendant raised the possibility
of stipulating to solatium or loss of consortium damages for the
first time in the last moments of its rebuttal on oral
argument.[13]

Because the possibility of a stipulation concerning non-
pecuniary damages was not raised until this late point, defendant

---

[12] In an unsworn statement, plaintiffs' counsel asserts that the
possibility of a stipulation regarding solatium or loss of consortium damages
was never proposed to plaintiffs' counsel.  Plaintiffs' Brief in Opposition to
Defendant's Motion for Reconsideration ("Pl. Rec. Br.") at 2.

[13] The relevant portion of the oral argument, found on pages 23-24 of
the 24 page transcript, reads:

> With respect to the argument about solatium, loss of consortium,
> let me say several things.  First of all, we've set forth
> authority for the proposition that the phrase "injury in person"
> does not include those types of elements, a term of art that is a
> term of limitation that wouldn't include loss of consortium or
> solatium.  Secondly, to the extent it does, again there are
> differences in the types of recovery that could be obtained,
> counterbalanced by what the Goldbergs can be taken in Israel, loss
> of life, future earnings, life expectancy.  Third, as your Honor
> knows, you can condition any FNC order with any conditions you
> want, obviously reasonable conditions.  One condition you could
> impose is that if there's FNC, UBS would have to stipulate to loss
> of solatium or loss of consortium damages in the other
> jurisdiction as we have offered to stipulate to trebling any
> compensatory damages award in Israel.

cannot raise it now.  See Nobel Ins. Co. v. City of New York, No.
00-CV-1328 (KMK), 2006 WL 284812, at *16 (S.D.N.Y. Sept. 29,
2006) (alteration in original) ("Normally, [the Court] will not
consider arguments raised for the first time in a reply brief,
let alone [at or] after oral argument."); see also Halpert
Enters., Inc. v. Harrison, No. 07-1144-cv, 2008 WL 4585466, at *3
(2d Cir. Oct. 15, 2008) ([G]iven [defendant's] failure to mention
this argument [in its papers], raising any such claim even
explicitly at oral argument would have been to no avail." (citing
In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 137
(S.D.N.Y. 2008) ("[T]his argument was raised for the first time
at oral argument and so was waived in terms of this motion."))).
In the absence of such a rule, parties would have an incentive to
withhold certain claims or defenses until the last moment, lying
in wait to spring onto their opponents unanticipated arguments in
reply briefs or in the final moments of oral argument.  Such an
outcome would not only be inefficient, but also manifestly
unjust.  Castro v. U.S., 540 U.S. 375, 386, 124 S.Ct. 786, 794
(2003) ("Our adversary system is designed around the premise that
the parties know what is best for them, and are responsible for
advancing the facts and arguments entitling them to relief.").

Second, defendant has not pointed to any controlling law or
evidence overlooked by Judge Sifton.  On a motion for
reconsideration, "the moving party [must] point to controlling

decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." New York v. Gutierrez, 623 F. Supp. 2d 301, 314 (E.D.N.Y. 2009). Defendant does not point to a single case in which FNC was granted with any condition similar to the one they belatedly propose, much less cite a case in which the denial of FNC dismissal was found to be improper in similar circumstances. The sole basis of defendant's motion, that "the Court appears to have overlooked its own ability to eliminate [] distinctions between the ATA and Israeli law," is controverted by the plain text of the September 24, 2009 opinion, in which Judge Sifton explicitly considered the possibility of imposing conditions on FNC dismissal, and indeed accepted one such condition proposed by defendant. See Goldberg, 660 F. Supp. 2d at 422 & n. 13 ("Such stipulations can assuage courts' concerns regarding potential deficiencies in the adequacy of a foreign tribunal, and a court may condition dismissal on the parties agreeing to such stipulations.").

Third, even if defendant had timely proposed "conditioning FNC dismissal on UBS stipulating that Plaintiffs could prove and recover U.S.-style lost consortium damages in an Israeli litigation," Def. Rec. Br. at 1, this request should be rejected. Unlike defendants proposed stipulation to pay treble the damages imposed Israeli court, which requires no judging or application

of law by the foreign tribunal, the proposed stipulation would require an Israeli forum to actively take evidence and judge the emotional damages suffered by plaintiffs.  Such a condition is unlike those typically imposed by courts, and raises distinct concerns of comity and enforceability.  Indeed, courts are hesitant to impose U.S. law on foreign courts when such law is "an unwarranted intrusion on the [foreign] forum's policies governing its judicial system."  Gross v. British Broadcasting Corp., 386 F.3d 224, 234 (2d Cir. 2004).  For example, in Gross, the district court granted defendant BBC's motion to dismiss on FNC grounds only after the parties agreed to waive their statutory rights under British law relating to contingent fees and fee-shifting for prevailing parties.  However, the Second Circuit reversed the district court's grant of FNC dismissal, emphasizing the importance of comity in FNC cases:

> It is not uncommon for a district court to qualify a dismissal for forum non conveniens on the movant's acceptance of certain conditions to reduce the prejudice to the plaintiff.  For example, if the district court is unsure that the defendant would in fact be amenable to suit in the proposed foreign forum, it may require the defendant to consent to jurisdiction in that forum before dismissing the case.
> . . .
> The conditions imposed in the case at bar are somewhat more troublesome to us because they are primarily institutional rather than personal in nature. . . . There is a point at which conditions cease to be a limitation on the defendant and become instead an unwarranted intrusion on the transferee forum's policies governing its judicial system.  By applying conditions that implicate the British legal system's rules on fee-shifting and the availability of contingent fees, the district court effectively stepped into

the middle of Britain's policy debate on those issues.
Principles of comity demand that we respect those policies.
We urge the district courts to be cognizant of the
prudential choices made by foreign nations and not to impose
conditions on parties that may be viewed as having the
effect of undermining the considered policies of the
transferee forum.

Id. at 234.

Furthermore, although courts have granted FNC dismissal

conditioned on a foreign tribunal's application of U.S.

procedural law, defendant has cited no case in which it was

conditioned on the application of U.S. substantive law, nor is

the Court aware of any such case.  See Tim A. Thomas, Annotation,

Validity and Propriety of Conditions Imposed Upon Proceeding in

Foreign Forum by Federal Court in Dismissing Action Under Forum

Non Conveniens, 89 A.L.R. Fed. 238 (1988) (collecting cases in

which FNC dismissal has been conditioned on, inter alia,

defendant consenting to the jurisdiction of the foreign court,

agreeing to waive any applicable statute of limitations defense

in the foreign forum, agreeing to satisfy any judgment that may

be entered in the foreign forum, or making witnesses or documents

available to the foreign tribunal).  Imposition of such a

condition is particularly problematic in this case because

defendant has provided no evidence that an Israeli court would

accept such a stipulation and agree to render an award of loss of

consortium or non-economic damages.[14]  Such a condition would

impose a task upon Israeli courts to determine an issue that is

does not confront in its work.  While the Israeli judiciary is

well-recognized for its quality and integrity, without a showing

that it is willing to undertake this task, we should be reluctant

to ask them to resolve the somewhat amorphous issue of loss of

consortium-type damages - a remedy Israeli law does not provide.

Counsel for defendant also failed to inform the court whether

their client would consent to such a condition.[15]  Finally, as

Judge Sifton stated at oral argument on September 21, 2009,

plaintiffs' decision to file this suit in New York rather than

pursue their claims in the forum where the attacks occurred is

entitled to considerable weight as a plausible effort to "get out

of the field of battle."  Tr. at 7.  As such, defendant's motion

---

[14] Defendant states that such a stipulation would be accepted by an Israeli court, citing the Reply Declaration of Profession Daniel More, defendant's expert on Israeli law ("More Decl.").  However, the relevant portions of Professor More's declaration state only that an Israeli court would permit parties to enter into a stipulation agreeing to treble damages, but makes no mention of U.S.-style lost consortium damages.  See Def. Rec. Br. at 3 (citing More Decl. ¶¶ 30-32).  At oral argument on December 29, 2009, defense counsel raised the possibility that defendant could stipulate to "the facts necessary for an Israeli court to enter an award of emotional or non-economic injury."  Tr. at 5.  Among the requirements for recovery of emotional damages is Israel is that the harm manifest as a disability of 20% (or more) resulting from a psychiatric illness or emotional disturbance caused by defendant's conduct.  Thus, regardless of how the stipulation is phrased, it is not clear how an Israeli court would calculate damages if plaintiffs fail to meet the 20% disability standard in fact.

[15] Confirming the ambiguity of defense counsel's statements at oral argument, defendant states in their instant papers that "[f]or avoidance of doubt, UBS would agree to such a stipulation."  This unsworn assertion, made for the first time on reconsideration, is not considered here.  See Litton Indus., 1989 WL 162315, at *3 (holding that a party in its motion for reconsideration "may not advance new facts, issues or arguments not previously presented to the court").

for reconsideration is denied.

**(2)**

**Motion to Certify the Court's September 24, 2009 Order for Interlocutory Appeal**

Defendant seeks to have this court certify the following three issues[16] for interlocutory appeal pursuant to 28 U.S.C. § 1292(b):

1. Whether ATA Section 2334(d)(3)'s FNC requirement that a foreign court must "offer[] a remedy which is substantially the same as the one available in the courts of the United States" means that the foreign court must offer a remedy "essentially the same in both type and magnitude as that afforded in this jurisdiction"? (Order at 21).

2. Whether it is constitutional to apply the ATA to UBS's alleged off-shore conduct based solely on UBS's unrelated United States activities and in the absence of any identified nexus between the off-shore conduct and the United States? (Order at 44-45).

3. Whether the "appears to be intended" prong of the ATA's "international terrorism" definition (Section 2331(1)(B)), is necessarily satisfied by a violation of Section 2339B or 2339C? (Order at 33).

---

[16] Notwithstanding defendant's request to certify three "issues," a district court certifies orders, not individual questions. See City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 391-92 (2d Cir. 2008) ("When a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and [the appellate court] may assume jurisdiction over the entire order, not merely over the question as framed by the district court." (citing U.S. v. Stanley, 483 U.S. 669, 676-77 (1987) (explaining that 28 U.S.C. § 1292(b) "brings the 'order,' not the question, before the [appellate] court."))). However, because none of the individual issues warrant certification of the September 24th Order, the distinction is not significant here.

**a.    Standard for Certification of an Order for Interlocutory Appeal**

A district court has the discretion to certify an order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) if the court "is of the opinion that: (1) the order 'involves a controlling question of law'; (2) 'as to which there is substantial ground for difference of opinion'; and (3) 'an immediate appeal of the order may materially advance the ultimate termination of the litigation.'"  Martens v. Smith Barney, Inc., 238 F. Supp. 2d 596, 599 (S.D.N.Y. 2002) (quoting 28 U.S.C. § 1292(b)).  Because an interlocutory appeal may "prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions," In re World Trade Cent. Disaster Site Litig., 469 F. Supp. 2d 134, 144 (S.D.N.Y. 2007), "only 'exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'"  Aspen Ford, Inc. v. Ford Motor Co., Nos. CV-01-4677 (CPS), CV-99-5978 (CPS), 2008 WL 163695 (E.D.N.Y. Jan. 15, 2008) (alteration in original) (citing Klinghoffer v. S.N.C. Achilee Lauro, 921 F.2d 21, 25 (2d Cir. 1990)); see also Capitol Records, Inc. v. MP3Tunes, LLC, No. 07 Civ. 9931 (WHP), 2009 WL 5102794, at *2 (S.D.N.Y. Dec. 14, 2009) ("Appeal is limited to those instances where the movant demonstrates the existence of exceptional circumstances

sufficient to overcome the general aversion to piecemeal litigation.") (citation and quotation marks omitted). "[D]istrict court judges have broad discretion to deny certification even where the statutory criteria are met." <u>Morris v. Flaig</u>, 511 F. Supp. 2d 282, 314 (E.D.N.Y. 2007) (quoting <u>SPL Shipping Ltd. v. Gujarat Cheminex Ltd.</u>, No. 06-CV-15375 (KMK), 2007 WL 1119753, at *1 (S.D.N.Y. Apr. 12, 2007)).

**b.  The Meaning of the Phrase "Substantially the Same" in 18 U.S.C. 2334(d)(3)**

Defendant contends that certification is warranted to permit the Second Circuit Court of Appeals to address the September 24th Order's interpretation of the phrase "substantially the same" as used in 18 U.S.C. § 2334(d)(3).  As discussed above, in a motion brought under 18 U.S.C. § 2333, the ATA includes an explicit provision that precludes <u>forum non conveniens</u> ("FNC") dismissal unless, <u>inter alia</u>, the case may be heard in a foreign court that "offers a remedy which is substantially the same as the one available in the courts of the United States."  18 U.S.C. § 2334(d)(3).  Judge Sifton's September 24, 2009 Order concluded that the remedies offered by an Israeli court differ from those available in a court of United States in a number of respects, including that:

> Israeli courts exclude emotional harm from
> loss-of-consortium damages by limiting those damages to
> the economic value of a substitute's cost on the market

> (e.g. the cost of obtaining a housekeeper, to
> compensate for the lost spouse's contribution to the
> maintenance of the household)[;] Israeli law provides
> no compensation in a wrongful death suit for the loss
> of companionship, affection and intimacy by the
> immediate family members of the victim; [and] emotional
> injury suffered as a result of the death of a loved one
> is generally not compensable unless it manifests as a
> psychiatric illness.

660 F. Supp. 2d at 423. Because the parties had not cited any case law interpreting the phrase "substantially the same" in the context of the ATA, and the court was not aware of any binding precedent interpreting that phrase, the September 24th Order considered as a matter of first impression whether the above distinctions precluded FNC dismissal in favor of an Israeli forum. Following a lengthy review of the statutory history of the ATA, Judge Sifton concluded that the ATA's use of the phrase "substantially the same" in 18 U.S.C. 2334(d)(3) requires a remedy that "is essentially the same in both type and magnitude as that afforded in this jurisdiction," and found that the remedies available in Israel did not meet that standard. 660 F. Supp. 2d at 420-23.

Applying the standard for certification of an interlocutory appeal, at issue here is whether: (1) the meaning of the term "substantially the same" is a controlling question of law; (2) there exists a substantial ground for difference of opinion on the meaning of the term; and (3) an immediate appeal of the order may materially advance the ultimate termination of this

litigation. Even assuming the first and third requirements for
interlocutory appeal were met[17], certification is not warranted
because there does not exist a substantial ground for a
difference of opinion on this issue.

Section 1292(b)'s requirement that there be a "substantial
ground for difference of opinion" may be met where there is
"substantial doubt that the district court's order was correct;"
Redhead v. Conf. of Seventh-Day Adventists, No. 03-CV-6187 (DLI),

---

[17] It is not clear that the meaning of the term "substantially the same"
is a controlling question of law because the requirement that a foreign forum
"offers a remedy which is substantially the same as the one available in the
courts of the United States" is a condition necessary, but not sufficient, for
FNC dismissal. Even if the existence of an adequate alternative forum is
established, the court must "balance private and public interest factors to
ascertain whether the case should be adjudicated in plaintiff's chosen forum
or in the alternative forum proposed by defendant," while giving the
appropriate degree of deference to degree of deference to a plaintiff's forum
choice. Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 70-75 (2d
Cir. 2003) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507-509 (1948)).
The Second Circuit has instructed that the selection of a United States forum
by expatriate U.S. citizens would typically "be entitled to less deference
than the choice of the same forum by a citizen residing in the forum because
. . . 'it would be less reasonable to assume the choice of forum is based on
convenience,'" (and therefore more likely that forum-shopping for a higher
damage award or for some other litigation advantage was the motivation for
plaintiff's selection). Pollux, 329 F.3d at 73 (2d Cir. 2003) (citing
Iragorri v. United Technologies Corp., 274 F.3d 65, 73 n.5 (2d Cir. 2001)).
However, the concern of forum shopping by foreign plaintiffs is of less
relevance here, where legislative history shows that Congress intentionally
changed FNC analysis to encourage suits in U.S. courts by those injured in
terrorist attacks occurring abroad. Additionally, the private and public
interest factors do not clearly favor Israel. Plaintiffs had a connection to
this district stemming from their joining in related proceedings in 2005 in
Coulter v. Arab Bank, plc., No. 05-cv-365 (E.D.N.Y, complaint filed Jan. 21,
2005), and the potential for overlapping expert and fact witness testimony may
generate efficiencies which make this district a convenient forum. Further,
as discussed in section 2(c), infra, the United States has a significant
interest in adjudicating a dispute arising out of an international terrorist
attack which resulted in the death of or injury to United States citizens.
Specifically, while Stuart Goldberg was not a U.S. citizen, the terrorist
attack is alleged to have caused harm to his surviving family members, who
were U.S. citizens. Plaintiffs also contend that at least one American
Citizen was killed in the bus bombing which killed Stuart Goldberg. Pl.
Motion to Dismiss at 25 n.15. Because there is no evidence before the court
to support such an assertion, I do not address what its relevance, if any,
would be to an analysis of the FNC factors under Gilbert.

2006 WL 2729035, *2 (E.D.N.Y. Sept. 25, 2006) (citation omitted);

where "there is conflicting authority on the issue;" or where the

issue "is particularly difficult and of first impression for the

Second Circuit." Aspen Ford, 2008 WL 163695, at *2 (citing

Morris, 511 F. Supp. 2d at 317).  However, the Second Circuit has

held that the "mere presence of a disputed issue that is a

question of first impression, standing alone, is insufficient to

demonstrate a substantial ground for difference of opinion."  In

re Flor, 79 F.3d 281, 284 (2d Cir. 1996); see also Carbotrade SPA

v. Bureau Veritas, No. 92-CIV-1459 (RPP), 1993 WL 60567, * 1

(S.D.N.Y. March 2, 1993) ("[Defendant has] failed to present a

single case or other legal authority showing that there is

'substantial doubt' that this Court was correct. . . . The

defendant correctly asserts that this issue is one of first

impression.  Though relevant, this fact does not, without more,

suffice to present a 'substantial ground for difference of

opinion' under 28 U.S.C. § 1292(b).") (citation omitted).  Cf.

Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 570

(S.D.N.Y. 2001) ("Section 1292(b) was not intended . . .to be a

'vehicle to provide early review of difficult rulings in hard

cases.'" (quoting German v. Fed. Home Loan Mortgage Corp., 896 F.

Supp. 1385, 1398 (S.D.N.Y. 1995))).[18]

---

[18]  The novelty of an issue may counsel against certification because
interlocutory appeal would require the Second Circuit to decide an issue
without the benefits afforded by a full record.  See 16 C. Wright, A. Miller,
E. Cooper, & E. Gressman, Federal Practice and Procedure § 3929, pp. 144-145

Defendant argues that the court's interpretation of the
phrase "substantially the same" is contrary to the plain meaning
of the word "substantially," and that "it is a difficult issue
because . . . the words themselves are not defined" in the
statute, thereby forcing the court to write on a 'blank slate.'"
Defendant's Motion to Certify the September 24, 2009 Order for
Interlocutory Appeal ("Def. Cert. Br.") at 6.  In support of its
contention, defendant cites Webster's Dictionary's definition of
the word "substantially," as "being largely, but not wholly that
which is specified."  Def. Cert. Br. at 7 (citing Webster's Ninth
New Collegiate Dictionary (1998)).

The cited definition, standing alone, fails to establish
that the statutory interpretation question is incorrect or
"particularly difficult."  As Judge Sifton concluded in the
September 24th Order, the meaning of the phrase "substantially
the same" need not be examined in isolation but rather must
properly be considered in light of the general purposes for which
the ATA was enacted, and how the language in question fits into
that statutory scheme.  Goldberg, 660 F. Supp. 2d at 421.  That
statutory history, recounted in a number of published opinions,
makes clear that Congress wanted to ensure that ATA suits were

(2009) ("an underdeveloped record may lead to ill-informed decision of an
important question.") (citing Koehler v. Bank of Bermuda Ltd., 101 F.3d 863,
866 (2d Cir. 1996)); see also Slade v. Shearson, Hammill & Co., Inc.,
517 F.2d 398, 403 (2d Cir. 1974) ("It would be the height of judicial folly,
we think, to attempt on an indeterminate factual record to make an abstract
exposition that would adequately cover the various contexts and reach the
proper overall results.").

not routinely dismissed on FNC grounds in favor of courts with

remedies less favorable to plaintiffs. See id. at 422

("[R]emedies in the bill were not an afterthought, but rather

[were] conceived of as a mechanism through which to accomplish

the primary purposes of the act"); see also Litle v. Arab Bank,

PLC, 611 F. Supp. 2d 233, 245 (E.D.N.Y. 2009) ("Senator Grassley

explained when introducing Section 2333 in 1991 [that] the

purpose of the ATA is that it . . . empowers victims with all the

weapons available in civil litigation [and] 'accords victims of

terrorism the remedies of American tort law.'" (citing 137 Cong.

Rec. S4511 (Apr. 16, 1991) (statement of Sen. Grassley) (emphasis

added))); Boim v. Quranic Literacy Inst. and Holy Land Found. For

Relief And Dev. ("Boim II"), 291 F.3d 1000, 1009-11 (7th Cir.

2002) (summarizing legislative history).

As originally drafted, the ATA's FNC provision lacked any

reference to the similarity of remedies offered by a foreign

forum. See S. 2465, 101st Cong. (1990). However, during the

Senate hearing on the ATA bill, Georgetown University Law

Professor Wendy Perdue addressed the issue of FNC dismissal,

noting that the less generous awards available in foreign forums

was a subject of concern:

> The possibility of a forum non conveniens dismissal is
> likely to be of great concern to plaintiffs. An award
> of civil damages by any other nation will almost
> certainly be substantially less generous than
> contemplated here because the other country will most
> likely award less in compensation and not treble the

>amount.  The <u>Piper Aircraft</u> case [<u>Piper Aircraft Co. v.</u>
><u>Reyno</u>, 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70
>L.Ed.2d 419 (1981)] suggests that the fact that the
>alternative forum will apply a substantially less
>favorable law ought not be an important factor in
>deciding whether to dismiss.  If it is your intent to
>assure victims substantial compensation, you might add
>language which makes clear that the fact that a
>plaintiff will likely recover substantially less in the
>alternative forum is an important factor to be weighed
>in deciding whether to dismiss the case.

Hearing Before the Subcomm. on Courts and Admin. Prac. of the S.

Comm. on Judiciary, at 130-31 (1990) (statement of Wendy Perdue,

Professor of Law).  That the statute was ultimately amended to

prohibit dismissal on FNC grounds unless a foreign court offered

a remedy which was "substantially the same" reflects Congress'

concern that the purpose of the statute would be undermined if

defendants could easily secure FNC dismissal to avoid the

generous damage provisions that would be available in the United

States.  In light of that statutory history, there can be no

question that Congress intended in 18 U.S.C. § 2334(d)(3) to

impose a higher burden to FNC dismissal than that present in the

traditional FNC analysis.  While courts have not yet fully

delineated the precise contours of how similar a foreign forum's

remedies would have to be to satisfy section 2334(d)(3),

defendant UBS has not established that the facts of this case

present a particularly difficult issue or that there is

substantial doubt that the district court's order was correct.

The declarations of both parties' experts indicate that Israeli

law would provide no compensation for plaintiffs' alleged
emotional injury,[19] a component of damages which routinely
accounts for the greater part of any recovery by plaintiffs in
cases filed under the ATA.  <u>See, e.g.</u>, <u>Knox v. Palestinian
Liberation Organization</u>, 442 F. Supp. 2d 62 (S.D.N.Y.); <u>Morris v.
Khadr</u>, 415 F. Supp. 2d 1323 (D. Utah 2006); <u>Estates of Ungar ex
rel. Strachman v. Palestinian Authority</u>, 304 F. Supp. 2d 232
(D.R.I. 2004).  Accordingly, because under any plausible
interpretation of the statute the remedies offered by an Israeli
forum are not "substantially the same" as those available in a
court of the United States, certification is not warranted with
respect to the meaning of that phrase.


**c. Constitutionality of Applying the ATA to UBS's Alleged
Off-Shore Conduct**

Defendant contends that certification is warranted in order
to allow the Second Circuit to resolve whether there exists a
sufficient nexus between UBS's alleged offshore conduct and the
United States to permit the ATA to be constitutionally applied to
the defendant.

In the criminal context, the Due Process Clause of the Fifth
Amendment limits Congress's power to regulate foreign entities'
conduct outside of the United to circumstances where there is a

---

[19] As discussed in Section I, <u>supra</u>, it is not clear that a stipulation
would eliminate this difference.

"sufficient nexus" between the conduct and the United States'

interest so that applying U.S. law "would not be arbitrary or

fundamentally unfair." U.S. v. Yousef, 327 F.3d 56, 111 (2d Cir.

2003). Even assuming that an equally stringent standard applies

in a non-criminal case,[20] certification is not warranted because

defendant has not established that the issue is one on which

there is a substantial ground for difference of opinion, and

because the issue is not a pure question of law.

In determining whether a sufficient nexus exists, courts may

properly consider, inter alia, the defendant's citizenship or

residency, the location of the acts allegedly giving rise to the

suit and whether those acts could be expected to or did produce

an effect in the United States. See, e.g., U.S. v. Sisal Sales

Corp., 274 U.S. 268, 275, 47 S.Ct. 592, 594 (1927) (". . . by

their own deliberate acts, here and elsewhere, [defendants]

brought about forbidden results within the United States. They

are within the jurisdiction of our courts and may be punished for

offenses against our laws."); U.S. v. Al Kassar, 582 F. Supp. 2d

488, 494 (S.D.N.Y. 2008) (holding nexus requirement satisfied by

complaint's allegations of plot to kill United States nationals

residing in Colombia); U.S. v. Clark, 315 F. Supp. 2d 1127 (W.D.

Wash. 2004) (holding sufficient nexus exists to prosecute crime

---

[20] The parties do not dispute that the Due Process clause applies to
foreign corporations such as UBS. See Helicopteros Nacionales de Colombia,
S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). In
contrast, the Second Circuit has held that the Due Process clause provides no
protection to foreign states. See Frontera Resources Azerbaijan Corp. v.
State Oil Co. of Azerbaijan Republic, 582 F.3d 393 (2d Cir. 2009) (holding
that foreign state is not a "person" for purposes of Due Process Clause).

by U.S. citizen or resident alien committed abroad against
foreign victim).  In determining whether Due Process is
satisfied, courts may also consider principles of international
law.  See U.S. v. Davis, 905 F.2d 245, 249 n.2 (9th Cir. 1990);
see also U.S. v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999) ("In
determining whether due process is satisfied, we are guided by
principles of international law.").  The ultimate question is
whether defendant's conduct is not "'so unrelated to American
interests as to render their [being sued] in the United States
arbitrary or fundamentally unfair.'"  Goldberg, 660 F. Supp. 2d
at 431 (alteration in original) (quoting Yousef, 327 F.3d at
112).

In light of defendant UBS': (1) general contacts with the
United States; (2) the United States' strong interest in
combating terrorism; and (3) recognized principles of
international law, defendant cannot show that there is a
substantial reason to doubt the correctness of Judge Sifton's
conclusion that defendant UBS' conduct is subject to the ATA, or
to conclude that the question is a difficult issue of first
impression warranting certification.

### i. General Contacts with the United States

"The nexus requirement serves the same purpose as the
'minimum contacts' test in personal jurisdiction.  It ensures
that a United States court will assert jurisdiction only over a
defendant who 'should reasonably anticipate being haled into

court' in this country." <u>Klimavicius-Viloria</u>, 144 F.3d at 1257

(citing <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286,

297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)); <u>see also</u> <u>Perlaza</u>, 439

F.3d at 1168 ("The nexus requirement is a judicial gloss applied

to ensure that a defendant is not improperly haled before a court

for trial. . . . [It] serves the same purpose as the minimum

contacts test in personal jurisdiction.") (citation omitted).

While defendant correctly points out that the mere existence of

personal jurisdiction will not always satisfy the nexus

requirement -- for instance, personal jurisdiction may be

obtained merely by serving defendants while he or she is passing

through a state[21] -- that distinction has little relevance to

this case. Defendant UBS is not an unsuspecting naif who has

been made subject to United States law through so-called "tag"

jurisdiction, but rather an international financial institution

with full time operations in New York City.[22] Defendant has not

cited any case holding the application of United States law to be

---

[21] <u>See, e.g.</u>, <u>Burnham v. Superior Court</u>, 495 U.S. 604, 619, 110 S.Ct.
2105, 109 L.Ed.2d 631 (1990) ("The short of the matter is that [personal]
jurisdiction based on physical presence alone constitutes due process."); <u>cf.</u>
<u>United States v. Aluminum Co. of Am.</u>, 148 F.2d 416, 443 (2d Cir. 1945) (Hand,
J.) ("We should not impute to Congress an intent to punish all whom [our]
courts can catch").

[22] Plaintiffs state in passing that in obtaining a license necessary to
maintain a branch in the United States, UBS knowingly and voluntarily agreed
to submit to the application of U.S. laws and regulations. <u>See</u> Plaintiffs'
Motion in Opposition to Defendant's Motion to Certify the September 24, 2009
Order for Interlocutory Appeal ("Pl. Cert. Br.") at 12. Defendant contends
that in obtaining a license it did no more than consent that United States law
apply to its United States operations. Because plaintiff has not identified
any specific license that contained such a waiver of defendant's due process
rights, this opinion does not address whether such a provision would satisfy
the nexus requirement for the extraterritorial application of the ATA to UBS's
off-shore operations.

arbitrary or fundamentally unfair as against a corporation that
engages in systematic and continuous activities within the State
of New York.  See <u>Perkins v. Benguet Consol. Min. Co.</u>, 342 U.S.
437, 448, 72 S.Ct. 413 (1952) (finding personal jurisdiction
present even where cause of action is unrelated to the
defendant's activities in the forum state provided that the
activities are sufficiently continuous and substantial to make
the assertion of jurisdiction reasonable) <u>reh. denied</u>, 343 U.S.
917 (1952).  That defendant has had sufficient contact with this
jurisdiction to subject it to general jurisdiction is a
significant factor in the analysis of whether application of
United States law would be "arbitrary or fundamentally unfair."
<u>See, e.g.</u>, <u>Allstate Ins. Co. v. Hague</u>, 449 U.S. 302, 317, 101
S.Ct. 633, 642, 66 L. Ed. 2d 521 (1981) ("By virtue of its
presence, [the defendant] can hardly claim unfamiliarity with the
laws of the host jurisdiction and surprise that the state courts
might apply forum law to litigation in which the company is
involved.");[23] <u>see also</u> Zachary Mills, <u>Does the World Need
Knights Errant to Combat Enemies of All Mankind? Universal
Jurisdiction, Connecting Links, and Civil Liability</u>, note, 66

---

[23] While <u>Hague</u> concerned due process limitations on state choice of law
in an inter-state context, rather than limits to the extraterritorial
application of federal law in an international context, the Due Process
requirement of a constitutionally sufficient nexus remains equally applicable.
<u>See</u> Lea Brilmayer & Charles Norchi, <u>Federal Extraterritoriality and Fifth
Amendment Due Process</u>, 105 Harv. L. Rev. 1217, 1223  (1992) (arguing that "the
Fifth Amendment Due Process Clause limits federal actions in much the same
manner that the Fourteenth Amendment Due Process Clause limits state
actions").

Wash. & Lee L. Rev. 1315, 1360 (2009) ("The presence of the

defendant in the prosecuting state's territory is the most

obvious of all connecting links."). However, it is not necessary

to resolve here whether the requite nexus will always be

satisfied by the availability of general jurisdiction, or whether

that question warrants certification, because the defendant's

presence in New York was only one factor on which the September

24th Order based its conclusion that the application of United

States law would not offend Due Process.[24]


### ii. The United States' Interest in Combating Terrorism

As the September 24th Order concluded, the existence of a

sufficient nexus to the interest of the United States is also

supported because of the United States' interest in combating

international terrorism. See Goldberg, 660 F. Supp. 2d at 431

(noting United States' interest in combating terrorism and

effects of attack on United States citizen plaintiffs). The ATA

explicitly recognizes that "combating international terrorism is

a paramount interest of the United States," irrespective of

whether the terrorist attacks themselves occur on United States

---

[24] Plaintiffs contend that the fact that any notice defendant received
of its customer ASP's designation as a Specially Designated Global Terrorist
is itself a significant contact with this case as it goes to the central
element of knowledge. This argument begs the question by assuming UBS's
offshore operations are subject to the ATA; if jurisdiction is lacking over
those off-shore entities, then their awareness of the fact that some act was
prohibited under U.S. law provides no independent basis for jurisdiction.
Further, at this early stage in the proceeding, there is no evidence aside
from speculative allegations concerning how, if at all, UBS learned of ASP's
status as an SDGT.

soil or abroad.[25]  <u>Id.</u>, at 431 (citing Pub. L. No. 104-132 §

301(a)(1)& 7, 110 Stat. 1250 (1996), <u>reprinted in</u> 18 U.S.C. §

2339B, note ("international terrorism is a serious and deadly

problem that threatens the vital interests of the United

States.")).  The United States has a clear interest in combating

terrorism both within its borders and abroad.  As Judge Bates

concluded in <u>Sisso v. Islamic Republic of Iran</u>,

> It is [] entirely foreseeable that an indiscriminate
> attack on civilians in a crowded metropolitan center
> such as [Jerusalem] will cause injury to persons who
> reside in distant locales-including tourists and other
> visitors to the city, as well as relatives of
> individuals who live in the area.  The ripples of harm
> that flow from such barbarous acts rarely stop at the
> banks of the Mediterranean Sea or the Jordan River, and
> those who engage in this kind of terrorism should
> hardly be surprised to find that they are called to
> account for it in the courts of the United States-or,
> for that matter, in any tribunal recognized by
> civilized peoples.

448 F. Supp. 2d 76, 90 (D.D.C. 2006).  <u>Cf.</u> <u>Al Kassar</u>, 582 F.

Supp. 2d at 494 (rejecting assertion that there was "no reason to

expect that U.S. law would by violated" by the conduct charged in

the Indictment because "agreeing to sell weapons to a terrorist

organization with the express purpose of killing innocent

civilians unquestionably violates the laws of all civilized

nations, which uniformly punish, prosecute, and condemn terrorist

---

[25]  Additionally, this court takes judicial notice of the fact that a large number of Americans are located in Israel as visitors or permanent residents.  <u>See</u> <u>Boim v. Holy Land Found. for Relief and Dev.</u> ("<u>Boim III</u>"), 549 F.3d 685, 693-94 (7th Cir. 2008) ("A knowing donor to Hamas. . . would know that Hamas was gunning for Israelis. . ., that Americans are frequent visitors and sojourners in Israel, [and] that many U.S. citizens live in Israel") (citing report on the basis of State Department data by American Citizens Abroad, an advocacy group for expatriates, that "in 1999 there were about 184,000 American citizens living in Israel, accounting for about 3.1 percent of the country's population.").

violence.").[26]

### iii. Principles of International Law

Finally, jurisdiction would not be clearly contrary to any recognized principles of international law.  Although compliance with international law alone will not render the extraterritorial application of federal law constitutional, it remains relevant to the analysis of whether a defendant could reasonably expect to be subject to the United States law, and in turn, whether the application of that law can be considered arbitrary or fundamentally unfair.[27]  See U.S. v. Davis, 905 F.2d 245, 249 n.2 (9th Cir. 1990) (noting in dicta that principles of international law are "useful as a rough guide" in determining whether a sufficient nexus exists, but that ultimate question is whether extraterritorial application of the statute would be "arbitrary or fundamentally unfair"); see also U.S. v. Pizzarusso, 388 F.2d

---

[26] To the extent this statement in Al Kassar suggests universal jurisdiction exists over all terrorist activities even absent any nexus to the United States, it has been abrogated by Yousef, 327 F.3d at 106-109 (discussed infra at note 28).  However, the statement remains relevant as an expression of the fact that a foreign defendant could reasonably expect to be haled into court in this country for providing material support to terrorists, at least where there exists some further basis for jurisdiction.

[27] International law is also relevant in a second respect: "[i]n the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law."  U.S. v. Ma, No. 03 CR. 734 (DAB), 2006 WL 708559, at *6 (S.D.N.Y. Mar. 21, 2006).  However, because Congress explicitly intended the ATA to apply extraterritorially, it would have been so applied even if doing so violated international law.  See Yousef, 327 F.3d at 86 ("[T]hat presumption can be overcome when Congress clearly expresses its intent to do so.").

8 (2d Cir. 1968) (considering principles of international law in finding jurisdiction existed to indict and convict foreign citizen of crime of knowingly making false statement in visa application); Caicedo, 47 F.3d 370, 372 (9th Cir. 1995) ("[A] defendant would have a legitimate expectation that because [the defendant] has subjected himself to the laws of one nation, other nations will not be entitled to exercise jurisdiction without some nexus."); Anthony J. Colangelo, Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law, 48 Harv. Int'l L.J. 121, 122 (2007) (concluding that "while the present constitutional landscape prescribes certain structural and due process limits on the United States' ability to project and apply extraterritorially its anti-terrorism laws, doctrines of international law intersect with the Constitution to avoid these limits, leaving the United States virtually unconstrained to extend the core panoply of its anti-terrorism laws to foreigners abroad.").

Courts have traditionally recognized five principles of international law under which the exercise of extraterritorial jurisdiction may be appropriate.  As summarized in U.S. v. Clark, 315 F. Supp. 2d 1127 (W.D. Wash. 2004), those principles include:

> (1) the objective territorial principle, under which jurisdiction is asserted over acts performed outside the United States that produce detrimental effects in the United States; (2) the protective principle, under which jurisdiction is asserted over foreigners for acts committed outside the United States that may impinge on

the territorial integrity, security, or political
independence of the United States; (3) the nationality
principle, under which jurisdiction is based on the
nationality or national character of the offender; (4)
the universality principle, which provides jurisdiction
over extraterritorial acts for crimes so heinous as to
be universally condemned[28]; and (5) the passive
personality principle, under which jurisdiction is
based upon the nationality of the victim.

(citing Restatement (Third) of Foreign Relations of Law of
the United States § 402 cmt. a (1987)); see also Matter of
Marc Rich & Co., A.G., 707 F.2d 663 (2d Cir. 1983); Yousef,
327 F.3d at 91 n.24 (same).  Both the objective territorial
principle and passive personality support jurisdiction
here.[29]  As discussed above, it cannot be said to be

---

[28] The Second Circuit has held that the universality principle does not
provide jurisdiction over crimes merely because they have been denominated as
"terrorism."  See Yousef, 327 F.3d at 106-109 ("We regrettably are no closer
now than eighteen years ago to an international consensus on the definition of
terrorism or even its proscription. . . . terrorism-unlike piracy, war crimes,
and crimes against humanity-does not provide a basis for universal
jurisdiction.").

[29] It is true that all the cases cited above arise in a criminal
context.  Whether the passive personality principle can be truly considered an
accepted basis of jurisdiction under international law is open to dispute,
especially in the civil context.  See, e.g., Christopher L. Blakesley and Dan
E. Stigall, The Myopia of U.S. v. Martinelli: Extraterritorial Jurisdiction in
the 21st Century, 39 Geo. Wash. Int'l L. Rev. 1 (2007) (observing that "the
passive personality principle is not widely accepted"); Andrea K. Bjorklund,
Reconciling State Sovereignty and Investor Protection in Denial of Justice
Claims, 45 Va. J. Int'l L. 809, 885 (2005) ("jurisdictional bases, like the
effects principle used in U.S. (and increasingly in EU) antitrust law, or the
passive personality principle, are more controversial"); Eric Talbot Jensen,
Exercising Passive Personality Jurisdiction Over Combatants: a Theory In Need
of a Political Solution, 42 Int'l Law. 1107, 1114 (2008) (noting that passive
personality jurisdiction "has been variously described as 'the most
aggressive' or 'exotic' form of jurisdiction and [is] certainly the most
controversial.");  Restatement (Third) of Foreign Relations § 402 cmt. d
(1987) ("Controversy has arisen as a result of economic regulation by the
United States and others, particularly through competition laws, on the basis
of economic effect in their territory, when the conduct was lawful where
carried out.").
The United States in particular has been reluctant to accept the passive
personality principle as a basis of jurisdiction in civil matters, at least
when invoked by foreign states.  For instance, in negotiations to develop an
international convention on the Recognition and Enforcement of Foreign

unforeseeable that a terrorist attack in a major
metropolitan center would harm United States citizens or
property, and the plaintiffs allegedly harmed are each
United States citizens.  See Terry Richard Kane, Prosecuting
International Terrorists in United States Courts: Gaining
The Jurisdictional Threshold, 12 Yale J. Int'l L. 294 (1987)
(noting 18 U.S.C. § 2331 "embraced for the first time the
passive personality theory of jurisdiction."); see also
Alexander J. Urbelis, Rethinking Extraterritorial
Prosecution in the War on Terror: Examining the
Unintentional Yet Foreseeable Consequences of
Extraterritorially Criminalizing the Provision of Material

---

Judgments, the United States has objected to the exercise of in personam
jurisdiction "where a defendant had no relation with the jurisdiction."  See
generally, Yoav Oestreicher, "We're On A Road to Nowhere" -- Reasons for the
Continuing Failure to Regulate Recognition and Enforcement of Foreign
Judgments, 42 Int'l Lawyer 59, 75 (2008); see also Ronald A. Brand, Due
Process, Jurisdiction and a Hague Judgments Convention, 60 U. Pitt. L. Rev.
661, 696-697 (1999).  Similarly, the American Law Institute's model federal
statute on the recognition and enforcement of foreign judgments expressly
excludes the nationality of a plaintiff as an accepted basis of jurisdiction,
noting that such a basis of jurisdiction is considered exorbitant under EU
conventions.  See ALI, Recognition and Enforcement of Foreign Judgments:
Analysis and Proposed Federal Statute § 6 & comments at pp. 84-91 (2005).
       However, Israel appears to accept the passive personality principle as a
legitimate basis of jurisdiction and would likely not consider the
extraterritorial application of its own law to be unreasonable under
circumstances similar to the instant suit.  See Ahmad v. Wigen, 726 F. Supp.
389, 398 (E.D.N.Y. 1989) (noting passive personality principle as basis for
Israeli law providing jurisdiction over any "person who committed abroad an
act which would have been an offense had it been committed in Israel and which
injured or was intended to injure the life, person, health, freedom or
property of an Israeli national or resident of Israel."); see also Restatement
(Third) of Foreign Relations § 403, Reporter Note 5 ("[I]t is useful to
consider whether the regulating state would regard it as reasonable were the
other state to exercise regulatory jurisdiction if the circumstances were
reversed."); Roger O'Keefe, The Grave Breaches Regime and Universal
Jurisdiction, 7 J. Int'l Crim. Just. 811, 825 n.58 (2009) (noting reliance by
Supreme Court of Israel on passive personality principle).

<u>Support to Terrorists and Foreign Terrorist Organizations</u>,
22 Conn. J. Int'l L. 313 (2007) (concluding extraterritorial
application of 2339A, 2339B, and 2339C are supported by
customary principles of international law).  Moreover, while
a complete consensus on internationally recognized bases of
jurisdiction is elusive, defendants have not established
that the exercise of jurisdiction in this particular case
would violate any accepted principles of international law.

In sum, defendant UBS cites no compelling basis to
doubt the correctness of Judge Sifton's conclusion that
jurisdiction was supported by the defendant's continuous
presence in New York and the United States' interest in
combating terrorism.

Defendant's argument for certification also fails because
the issue is not a pure question of law.  "The 'question of law'
certified for interlocutory appeal 'must refer to a "pure"
question of law that the reviewing court "could decide quickly
and cleanly without having to study the record."'"  <u>Morris v.
Flaig</u>, 511 F. Supp. 2d 282, 315 (E.D.N.Y. 2007) (citing <u>In re
Worldcom, Inc</u>., No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y.
June 30, 2003)).  Here, defendant does not argue "that the Court
applied the wrong legal standard . . . . [r]ather, the essence of
[defendant's] argument is that the Court incorrectly applied the
law to the facts presented."  <u>Stone v. Patchett</u>, No. 08 CV 5171
(RPP), 2009 WL 1544650, at *2 (S.D.N.Y. June 3, 2009).  Indeed,
there is no dispute that, as Judge Sifton stated, the Due Process

clause is satisfied where there exists "a 'sufficient nexus'
between the conduct and the United States' interest so that
applying U.S. law 'would not be arbitrary or fundamentally
unfair.'" Goldberg, 660 F. Supp. 2d at 431 (quoting Yousef, 327
F.3d at 111).  Instead, defendant's only contention is that the
nexus in this case was, on the facts presented, insufficient.[30]
Even if a substantial ground for difference of opinion existed as
to whether a sufficient nexus exists to ensure a suit against
UBS's would not be arbitrary or fundamentally unfair, it is an
inquiry requiring resolution of disputed facts rather than an
issue of pure law, and accordingly is not an appropriate basis
for certifying the September 24th Order for interlocutory review.

**d. Whether a violation of 18 U.S.C. §§ 2339B or 2339C Will
Necessarily Qualify as "International Terrorism" Under 18
U.S.C. 2331(1)**

Defendant's final asserted ground for certification
concerns the September 24th Order's conclusion that civil
liability under section 2333(a) may be adequately pled by
alleging a violation of 18 U.S.C. §§ 2339B or 2339C.

---

[30] Defendant erroneously asserts that "because the Complaint's
allegations are assumed to be true on appeal of a Rule 12(b)(5) motion, there
would be no factual disputes for the Second Circuit to resolve."  Def. Cert.
Br. at 6.  However, because the nexus requirement is a component of the
jurisdictional requirement, "the court has the power and the obligation to
consider matters outside the pleadings, such as affidavits, documents, and
testimony, to determine whether jurisdiction exists."  Parks v. Office of
Temporary and Disability Assistance, No. 09 Civ. 3079 (JGK), --- F. Supp. 2d
---, 2009 WL 5126572, at *1 (S.D.N.Y. Dec. 23, 2009); see also U.S. v.
Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998) ("the question of
nexus. . . is part of the jurisdictional requirement.").

To situate the issue in its statutory context,

plaintiff's seek damages under 18 U.S.C. § 2333(a), which

provides:

> Any national of the United States injured in his or her
> person, property, or business by reason of an act of
> international terrorism, or his or her estate,
> survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and
> shall recover threefold the damages he or she sustains
> and the cost of the suit, including attorney's fees

The term "international terrorism" is defined for purposes

of the ATA in 18 U.S.C. § 2331(1):

> (1) the term "international terrorism" means
> activities that--
> (A) involve violent acts or acts dangerous to
> human life that are a violation of the
> criminal laws of the United States or of any
> State, or that would be a criminal violation
> if committed within the jurisdiction of the
> United States or of any State;
> (B) appear to be intended--
> (i) to intimidate or coerce a civilian
> population;
> (ii) to influence the policy of a government by
> intimidation or coercion; or
> (iii) to affect the conduct of a government by
> mass destruction, assassination, or
> kidnapping; and
> (C) occur primarily outside the territorial
> jurisdiction of the United States, or
> transcend national boundaries in terms of
> the means by which they are accomplished,
> the persons they appear intended to
> intimidate or coerce, or the locale in which
> their perpetrators operate or seek asylum.

At issue is whether a violation of §§ 2339B or 2339C, which

provide criminal penalties for the provision of funds or

material support to terrorists,[31] satisfies § 2331(1)(B)'s "appears to be intended" prong.

In <u>Boim II</u>, the Seventh Circuit Court of Appeals granted defendants' petition for interlocutory appeal in order to address, among other questions, whether "18 U.S.C. § 2333 incorporate[s] the definitions of international terrorism found in 18 U.S.C. §§ 2339A and 2339B?" 291 F.3d at 1007. Resolving that question in the affirmative, the Seventh Circuit wrote:

> Because Congress intended to impose criminal liability
> for funding violent terrorism, we find that it also

---

[31] 18 U.S.C. § 2339B provides:

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339C provides criminal penalties for whomever

by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out--
(A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or
(B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

intended through sections 2333 and 2331(1) to impose
civil liability for funding at least as broad a class
of violent terrorist acts. If the plaintiffs could show
that [defendants] violated either section 2339A or
section 2339B, that conduct would certainly be
sufficient to meet the definition of "international
terrorism" under sections 2333 and 2331.

*Id.* at 1015. Following a jury verdict for the plaintiff,

the Seventh Circuit again addressed this issue <u>en banc</u> in

<u>Boim III</u>. Speaking for the majority, Judge Posner wrote:

[D]onations to Hamas, by augmenting Hamas's resources,
[] enable Hamas to kill or wound, or try to kill, or
conspire to kill more people in Israel. And given such
foreseeable consequences, such donations would "appear
to be intended . . . to intimidate or coerce a civilian
population" or to "affect the conduct of a government
by . . . assassination," as required by section 2331(1)
in order to distinguish terrorist acts from other
violent crimes, though it is not a state-of-mind
requirement; it is a matter of external appearance
rather than subjective intent, which is internal to the
intender.

549 F.3d at 694 (ellipses in original). The court concluded

that a violation of section 2339A will suffice to establish

section 2331(1) liability.[32] While the Seventh Circuit did

not directly address whether section 2339C may also serve as

---

[32] Defendant contends that the Seventh Circuit's conclusion is merely
dicta because the defendants had conceded in the district court that the
complaint met the "appears to be intended" prong of 18 U.S.C. 2331's
definition of "international terrorism," (18 U.S.C. 2331(1)(B)) and thus the
only issue before the court was whether plaintiffs had adequately pled that
defendants conduct "involve[d] violent acts" in violation of 2331(1)(A). That
contention is of limited relevance here because the Seventh Circuit's
conclusion would not be binding on this court even if it were not dicta
(though its explicit and considered statutory interpretation would almost
certainly be heeded by the trial courts of that district). <u>See U.S. v. Bell</u>,
524 F.2d 202, 206 (2d Cir. 1975) (noting distinction "between 'obiter dictum,'
which constitutes an aside or an unnecessary extension of comments, and
considered or 'judicial dictum' where the Court. . . is providing a
construction of a statute to guide the future conduct of inferior courts.").

a predicate for 2333(a) liability,[33] its holding has been
interpreted as applying equally to that section, and
defendants cite no basis to hold otherwise.  See, e.g.,
Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 581 (E.D.N.Y.
2005) (noting that violations of 2339A, 2339B, or 2339C will
served "as predicate crimes giving rise to civil liability
under the ATA.").

     Defendant contends that the Seventh Circuit concluded
merely that a violation of section 2339 would satisfy the
requirement that defendant's conduct "involve[d] violent
acts."  However, quite the contrary, the court concluded
that sections 2339A and 2339B make clear Congress' intent
that the intentional (or reckless) provision of material
support to a terrorist organization fulfills each prong of
Section 2331(1)'s definition of "international terrorism,"
and therefore suffice to establish liability under Section
2333(a).  See Boim II, 291 F.3d at 1013-15 ("If the
plaintiffs could show that [defendants] violated either
section 2339A or section 2339B, that conduct would certainly
be sufficient to meet the definition of 'international
terrorism' under sections 2333."), Boim III, 549 F.3d at 700
("[W]hether it makes good sense or not, the imposition of

_____

[33]  Because the victim of the terrorist attack at issue in this case,
Stuart Goldberg, was not a United States citizen, neither § 2339A nor § 2332
are applicable here.

civil liability through the chain of incorporations is compelled by the statutory texts - as the panel determined in its first opinion."). However, the ultimate issue is not what the Seventh Circuit held, but rather whether the issue they confronted warrants certification in this circuit. As explained below, the issue is not one on which there exists a substantial ground for difference of opinion; accordingly, certification is not warranted.

Following the Seventh Circuit's lead, numerous authorities have similarly interpreted section 2331(1).[34] See Strauss v. Credit Lyonnais, S.A., No. CV-06-0702 (CPS), 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."); Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006) (same); Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257, 268 (E.D.N.Y. 2007) ("[V]iolations of sections 2339A, 2339B(a)(1), and 2339C can serve as predicate crimes giving rise to liability under the ATA"); see also Jason Binimow, Validity, Construction, and Application of 18 U.S.C.A. § 2333(a), Which Allows U.S. Nationals Who Have Been Injured "By Reason of Act of International Terrorism"

---

[34] Defense counsel conceded at oral argument on December 29, 2009 that they are aware of no case law supporting their position. Tr. 36.

to Sue Therefor and Recover Treble Damages, 195 A.L.R. Fed.
217 at § 12 (2004) (citing Boim II for the proposition that
violation of §§ 2339A or 2339B give rise to § 2333(a)
liability).  Cf. Andrew Peterson Addressing Tomorrow's
Terrorists, 2 J. Nat'l Security L. & Pol'y 297, 335 (2008)
("[T]he material support statutes are an attempt to create a
specific inchoate crime for terrorism, aimed especially at
financiers.").  The analysis is sensible: knowingly
furthering a crime through the provision of funds or
material support is the sort of activity that typically
gives rise to secondary liability (whether designated as
"aiding or abetting" or by some other name).[35]  This logic
is mirrored in numerous other contexts.  For example, under
the United States Sentencing Guidelines, a violation of
section 2339A is sufficient to warrant application of the
terrorism enhancement to a defendant's offense level
calculation.  See U.S.S.G. § 3A1.4 Application Note 2.
Similarly, under federal immigration law, for purposes of
determining whether an alien is ineligible for a visa or
admission to the United States for having "engaged in
terrorist activity," that term is defined to include having
provided material support or funds to a terrorist

---

[35] As Judge Posner explained in Boim III: "Primary liability in the form
of material support to terrorism has the character of secondary liability.
Through a chain of incorporations by reference, Congress has expressly imposed
liability on a class of aiders and abettors." Id. at 691-92.

organization while the donor knew or reasonably should have
known the identity of the recipient. See 8 U.S.C.A. §
1182(A)(3)(B)(vi). In order for the Secretary of State to
determine that an organization "engage[s] in terrorist
activity" for the purpose of designating it as a "foreign
terrorist organization" (as Hamas has been designated), the
Secretary may find that the organization has provided
material support to terrorist organizations. See 8 U.S.C.
§ 1189 (incorporating definitions of 8 U.S.C. §
1182(a)(3)(B)). Finally, for purposes of crafting an
exception to the Foreign Sovereign Immunities Act, Congress
permits foreign states that have been designated state
sponsors of terrorism to be sued in United States courts not
only for acts of terrorism, but also for providing material
support to terrorists in violation of 2339A. See 28 U.S.C.
§ 1605A(a) & (h).[36]  In light of the persuasive case law and
logic supporting the September 24th Order's conclusion that
violations of sections 2339A-C may serve as predicates for
2333(a) liability, this question does not warrant
certification for interlocutory appeal.

---

[36] The Boim II decision explicitly considered the passage of 28 U.S.C. §
1605(a)(7) as evidencing congressional intent that material support violations
may give rise to civil liability under section 2333(a). See Boim II, 291 F.3d
at 1015-16. 28 U.S.C. § 1605(a)(7) was repealed in 2008 and replaced by §
1083(a)(1) of the National Defense Authorization Act for Fiscal Year 2008
(NDAA), 122 Stat. 338, 28 U.S.C. § 1605A, which is identical in all respects
relevant to this discussion.

**CONCLUSION**

For the reasons set forth above, defendant UBS's motion for reconsideration and motion to certify the September 24, 2009 Order for interlocutory appeal are both denied.  The Clerk is hereby directed to transmit a copy of the within to the parties and the Magistrate Judge.


SO ORDERED.

Dated:     Brooklyn, NY
           Mar. 5, 2010

                    By: _____/s/_____
                         United States District Judge